Case 6:22-cv-02222-PGB-UAM    Document 1-1    Filed 11/30/22    Page 1 of 138 PageID 8

**IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY**

| | | |
|---|---|---|
| **STEPHEN M. DAVIS** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2022-CA-003432-O** |
| | : | |
| **v.** | : | |
| | : | |
| **ORANGE COUNTY** | : | |
| | : | |
| **Defendant.** | : | |

**<u>FIRST AMENDED COMPLAINT</u>**

COMES NOW, Plaintiff Stephen M. Davis, by and through undersigned counsel, and petitions this Court for redress and damages against Defendant for violating his rights under Florida's Whistleblower Act Fl. Stat. § 112.3187, and for retaliating against him as prohibited by Title VII of the federal Civil Rights Act of 1964, (42 USC §2000e-2, *et seq*, §1981a), as amended, the Americans with Disabilities Act of 1990 (42 USC §12101 *et seq*), as amended, and Fl. Stat. §760.10(7), alleging as follows:

**INTRODUCTION**

1. Stephen M. Davis was a Battalion Chief for Orange County Battalion 4, until his unlawful termination on October 19, 2021. As Battalion Chief, it was his responsibility to run the battalion according to outlined principles, and to discipline and issue written reprimands to his subordinates who were in violation of required standards. Moreover, as Battalion Chief, it was his duty to lead the firefighters under his command and protect their best interests. Chief Davis led with his decades of experience and protected those under his command by following the law and standards of conduct for his department. For abiding by federal and

state law and following union procedures to disclose and report his employer's violations of law and negligence, Chief Davis was illegally terminated from his position.

2. Due to the covid-19 Pandemic, Defendant, through Mayor Demings, announced a vaccinate or terminate policy ("vaccine mandate") on July 28, 2021.  Under impact negotiations in light of the vaccine mandate, the Orange County Fire Fighters Association, specifically I.A.F.F., Local 2057 (the "Union"), asserted that it reached an agreement with Defendant that, in lieu of vaccinations, employees were allowed to submit exemption requests or vaccination certification by September 30, 2021. Those who did not submit a request or vaccination certification on time were subjected to a written reprimand, but with no further disciplinary action to be taken nor any evaluation weight be given to the written reprimand.  All unvaccinated employees were to be subject to weekly mandatory covid-19 testing.

3. On October 5, 2021, Chief Davis received a general order to give written reprimands for alleged violations of the vaccine mandate deadline.  He knew the list of employees under his command to receive written reprimand against the vaccine mandate violated the union agreement, and because reprimands were to be given to those seeking exemption, violated both state and federal laws. Chief Davis properly brought this error to his supervisor and withheld discipline against those under his command until the list could be verified, but his supervisors up his chain of command refused to verify the list.

4. Instead of looking into the clear procedural and legal violations raised by Chief Davis, or even making a call to Human Resources to make a quick verification of the reprimand list, his superiors gave him a direct order to issue the improper written reprimands.  When he refused, Chief Davis was immediately relieved of duty and charged with multiple counts of wrong-doing.

5.  It is precisely this situation that Florida law prohibits, where an ethical employee is terminated for properly disclosing information and reporting to his chain of command violations of law, abuse, and gross neglect of duty by a public agency, and this malfeasance must be remedied for the victimized employee. Defendant is the wrong-doer. Defendant violated state and local laws and violated a negotiated agreement. Chief Davis should not be punished for Defendant's wrong-doing. Defendant must not be allowed to retaliate and punish conscientious employees like Chief Davis.

## PARTIES

6.  Plaintiff Stephen Davis resides in Mount Dora, Florida and at all times pertinent to this complaint, was an employee within Orange County Fire and Rescue, reporting to the Orange County Fire Chief. Chief Davis worked within Field Operations as a lieutenant and then battalion chief. He had been employed by OCFR for nearly fifteen years before being unlawfully terminated on October 19, 2021.

7.  Defendant Orange County employed Chief Davis within the county Fire and Rescue department. Its legislative branch is comprised of the County Board of County Commissioners; and county Mayor Jerry L. Demings is both chair of the BCC and the head of the executive branch of the Orange County government. Pursuant to Fla. Stat. 48.111, Mayor Demings is the agent for service of process against Defendant.

## JURISDICTION

8.  Jurisdiction is proper in the Circuit Court for Chief Davis' state and federal claims under Fla. Stat. § 26.012 and pursuant to Fla. Stat. § 112.3187(8)(c) of the "Whistle-blower's Act" and Fl. Stat. § 760.11(4), under which Chief Davis brings his claims.

9. As this matter involves the Orange County government and a former public employee of Orange County, this matter is properly brought before the Circuit Court in and for Orange County.

10. All conditions precedent to this action have occurred, have been performed, or have been waived.

## BACKGROUND FACTS

### *Plaintiff Battalion Chief Stephen Davis was an Exemplary Employee*

11. Plaintiff faithfully served the people of Orange County under Orange County Fire and Rescue ("OCFR") for almost fifteen years, three of those years as Battalion Chief, until his unlawful termination in October 2021.

12. Chief Davis during his years of service received commendations for several Unit Citations for Service in saving lives of children and adults in perilous conditions in 2009, 2010, 2012, and 2019. He has received several Life Saving Awards, including in 2014 and 2016. OCFR has declared in honoring Chief Davis for his service that he "demonstrated OCFR's values of duty, respect, and integrity to the fullest extent."

13. He was also trained and approved to act as Assistant Chief; and having interviewed for the position, he was on the current and active promotional list for Assistant Chief prior to his request for religious accommodation in lieu of obtaining covid-19 vaccination. Prior to serving with OCFR, Chief Davis had years of experience as a medic, including with the military. He has completed many special operations trainings in multiple disciplines: Dive Instructor, Critical Care Paramedic, and Preceptor. He holds a Masters degree in Emergency Disaster Management, a Bachelors degree in Fire Emergency Services, and an Associates degree in EMS. Given his experience and training, Chief Davis also pioneered and developed the current OCFR Paramedic evaluation and assessment system. Prior to his

termination, Chief Davis also oversaw and managed the Community Assessment Response Team (CART) during local disasters for OCFR.

14. In his role as Battalion Chief, Plaintiff was responsible to oversee and manage the employees of six stations within the county, representing over 50 employees. Among other management and supervisory responsibilities, a Battalion Chief is the officer that issues discipline in OCFR. He is well versed in the standards of conduct and the disciplinary matrix, including standard progressive discipline and where discretion is available in a given circumstance. However, any discipline above a written reprimand is handled at a higher level by the Assistant Chief in the employee's chain of command.

### *Defendant Orange County's Vaccine Mandate*

15. On July 28, 2021, Mayor Demings announced a local state of emergency due to covid-19, and in conjunction therewith, Defendant instituted a vaccine "requirement" for all Orange County employees, as announced by the mayor on the same day. All employees were required to submit certifications of the Johnson & Johnson vaccine or the first dose of the two-dose Pfizer and Moderna shots by August 31, 2021. As the deadline approached, Defendant pushed back the deadline to September 30, 2021. Defendant's written announcement of the vaccine mandate declared that the county would engage in impact negotiations over the change in employment terms with labor unions, and employees were instructed that religious or medical exemptions must be submitted by September 30, 2021.

16. On August 25, 2021, Chief Davis submitted his religious exemption request against covid-19 vaccination. **Exhibit A.** Upon information and belief, Defendant has never processed, approved, or denied Chief Davis' exemption request.

17. On behalf of firefighters employed by Defendant, their Union initiated discussions in advance of the September vaccination deadline and asserted a negotiated Memorandum of Understanding ("MOU") was reached on September 30, 2021 after the close of business. **Exhibit B.**

18. The MOU reiterated the extended deadlines imposed by Defendant for the vaccine mandate, but also provided that those who had met the deadline to certify their vaccination by August 31 would receive money incentives; that those who requested timely exemptions and were approved or those who obtained no exemption and remained unvaccinated would be subject to mandatory weekly covid-19 testing; and those who did not certify vaccination nor request exemption by September 30 would receive one written discipline in their employee file with "no further disciplinary action" under the mandate. It further specified that, should an employee receive written discipline, the reprimand would "not be considered or used in the bargaining unit member's performance evaluation." However, if any employee who did not comply with the vaccine mandate further refused weekly testing, additional discipline would apply, including beyond written reprimand. **Exhibit B.**

19. Weekly testing protocol with written reprimands where applicable under the MOU began in OCFR on October 4, 2021. Chief Davis was informed of the testing and discipline protocol (GO-21-016) under the MOU as an officer in charge of issuing discipline under the MOU. Battalion Chiefs would receive a written list of employees who were to be issued discipline and a list of employees who were required to test on the first shift of the week under the MOU.

20. The night of imposition of the MOU, early on October 1, 2021, several dozen firefighters and first responders of OCFR, including Chief Davis, filed a lawsuit before this Court (*Wheat, et*

*al. v. Orange County*, 2021-CA-009579-O) against Defendant Orange County to stop the vaccine mandate, citing constitutional grounds violating fundamental rights of privacy and Due Process and Equal Protection violations and asserting Mayor Demings was also without legal authority to impose the mandate.

### *Defendant Demanded that Chief Davis Comply with Unlawful Orders, and He Reported the Unlawful Orders Through Chain of Command*

21. On October 5, 2021, Chief Davis began his shift, and toward mid-afternoon, Assistant Chief (AC) Buffkin called the battalion chiefs under her command to Chief Davis' station 51 to advise them on the new scheme under the vaccine mandate and MOU and provide some instruction.

22. Finally, after close of business, Chief Davis received a list from Defendant's Centralized Staffing Unit ("CSU") through AC Buffkin including every employee in C shift for all battalions who were to receive written reprimand and be subject to covid-19 testing. Twelve of the nearly 100 names on the list were in Chief Davis' Battalion.

23. Chief Davis reviewed the names, and based on his personal knowledge of the employees under his charge, he was aware that certain of the individuals listed had actually timely requested exemption from the mandate, and according to the MOU terms as well as state and federal civil rights law prohibiting adverse employment action for protected conduct, should not have been listed for discipline. He was also familiar with the circumstances for employees under other Battalions and knew the error was widespread. Still others were vaccinated but were nonetheless listed for reprimand.

24. Chief Davis understood that issuing discipline to an individual for compliance when that individual had lawfully requested exemption was a violation of state and federal laws, and a

further violation of the MOU with Defendant, constituting violations of the fundamental rights of OCFR employees, malfeasance, misfeasance, abuse, and gross neglect of duty on the part of Defendant.

25. Since he had received his list for reprimand after close of business, Chief Davis could not contact Human Resources to verify the status of the employees on his list.  He therefore had a phone conversation with AC Buffkin that evening regarding his concerns of Defendant's unlawful conduct and objecting to his being commanded to participate therein.

26. OCFR Department Rules 33 and 35 govern the department and provide as follows:

> R.33 Unlawful Orders
> Employees shall not knowingly issue any order that is in violation of laws, statutes, ordinances, rules and regulations, or SOPs.
>
> R.35 Disobedience to Unlawful Orders
> No employee is expected to, or shall obey any order, that he/she knows to be contrary to federal or state law or County ordinance.  At the time an unlawful order is issued, the employee shall:
> - Advise the issuing authority of its illegality.
> - Should that authority persist in demanding compliance, an employee of superior rank or status to all parties involved should be summoned to decide the controversy.
> - Responsibility for refusal to obey rests with the employee, and he/she shall be required to justify his/her actions.  He/she shall, prior to the conclusion of the tour of duty in which the order was given, report the facts in writing to the Division Chief or Deputy Chief/Manager through official channels.

**Exhibit C – material sections of OCFR Rules**

27. Chief Davis is subject to the OCFR Rules and Regulations by specific reference of Article 9 of Unit B IAFF collective bargaining agreement ("CBA") with Defendant.  **Exhibit D.**  Also under the CBA Unit B, Article 10, Defendant through OCFR leadership may only discipline employees "for just cause."  Additionally, the only provisions for discipline and grievance and appeal procedures applicable to Chief Davis' employment are those within the CBA.

28. In accordance with OCFR Rule 35, Chief Davis expressed his concern regarding the unlawful order to issue discipline to the twelve employees on his list.  He provided details by telephone to his superior Assistant Chief Buffkin regarding the laws he believed would be violated if he were to pursue enforcement of the county's vaccine mandate and issue discipline to all twelve individuals on his list.

29. Specifically, he cited in the call Fl. Stat. § 252.38(4) from the lawsuit in which he was a plaintiff, showing the mayor had no authority to impose the mandate; that any MOU testing alternatives were to be enforced only until local state of emergency ended (which was ended by operation of law, but ignored and violated by Defendant through misconduct of Mayor Demings); Nuremburg Code regarding unlawful experimentation on people (the vaccines available were untested, emergency use authorized only) without informed consent; the fact that he personally had filed his religious exemption and was being discriminated against under the segregating nature of Defendant's vaccine mandate, even with the function of the MOU terms; that, like him, other employees in OCFR who sought exemption were also being discriminated against on that basis under the vaccine mandate and segregated alternative testing scheme; and that, to issue written discipline against those employees who sought exemption violated Florida's civil rights law and federal law under Title VII and Americans with Disabilities Act.

30. Chief Davis emailed AC Buffkin that evening regarding his concerns in enforcing the written reprimands and testing protocol. **Exhibit E**.  He would not comply with the order to issue discipline, at minimum, unless and until all names were verified through Human Resources for compliance with federal and state law.  Even so, Chief Davis made it clear he considered the entirety of the vaccine mandate unlawful, indeed as he had expressed in the Complaint

which he filed with co-plaintiffs on October 1, 2021.  Chief Davis is the only battalion chief, tasked in his position with discipline of those under his command, who joined that lawsuit against Defendant's vaccine mandate.

### *Defendant Terminates Chief Davis for Reporting Unlawful Orders, Then Defendant Admits the Orders Issued Were Unlawful.*

31. During the shift on October 5, Chief Davis met with AC Buffkin to express his valid concerns regarding the accuracy of the list of twelve employees to receive a written reprimand.  Another battalion chief (BC) Sherrill was present at the meeting as representative of the union ("steward").  Chief Buffkin disregarded Chief Davis' concerns, failed to follow OCFR Rule 35 and call a ranking officer in chain of command to resolve the dispute, and instead gave a direct order to Chief Davis to issue the reprimands, without acknowledging or verifying if his concerns were correct. Chief Davis refused. Chief Davis was then immediately relieved of duty by AC Buffkin.

32. Later discovery under public records request shows Chief Davis was not the only employee or battalion chief raising the issue of error in the disciplinary lists on October 5, 2021. Ronald Joseph, a newer employee, timely requested accommodation from the vaccine mandate and received notice of the same from HR before close of business on September 30, 2021.  On October 5, he forward the response email from HR to his command, Lieutenant Daniel Novoa, who promptly forwarded the same to his battalion chief Juan Atan, stating the reprimand should be null and void.  The same night, around 11pm on October 5, BC Atan forward the same thread to AC Buffkin asking for her instruction in light of the obvious unlawful reprimand.  **Exhibit F.**

33. Having just suspended Chief Davis only hours before regarding the *same unlawful orders*, AC Buffkin doubled down and responded to BC Atan to issue the reprimands regardless of law, and that HR would "update their records" and "discipline will be adjusted accordingly once HR confirms the status." She also instructed that the employee needed to contact HR to "ensure they update his status," even though she had the email in front of her showing HR's confirmation response regarding receipt of the accommodation request on September 30.
**Exhibit F.**

34. BC Sherrill heard Plaintiff's concerns in the meeting with AC Buffkin on October 5 and brought them forward to Human Resources the next day. BC Sherrill was one of many employees on a disciplinary list to receive reprimands, but he had complied with the vaccine mandate by sending his documentation timely. In his email, he questioned the lawfulness of his receiving discipline, while having sought exemption timely.

35. Because of the BC Sherrill's inquiry, that same day, October 6, 2021, Defendant, through OCFR HR, acknowledged the erroneous disciplinary lists. HR responded to BC Sherrill that, "the department has been asked to first verify" with employees their status and whether they filed exemption requests, and "after that verification is done, you would ultimately not receive any discipline if you submitted on or before Sept 30th", even if the employee name were initially included in a disciplinary list. **Exhibit G.** Division Chief Wadja was copied in the email thread with HR and BC Sherrill regarding the unverified and erroneous discipline lists.

36. Indeed, even AC Buffkin acknowledged Defendant's error. Despite having issued Chief Davis a direct order to issue discipline to individuals whose status was unverified on his list the day before, early on October 6, she emailed Battalion Chiefs under her supervision

reminding them to complete written reprimands under the vaccine mandate and MOU.  She also told them, "Remember if anyone has received the vaccine or believe their status is incorrect, have them email 3 people at HR: Charles Welch, Kathy Mora AND Latarsha Gibson and include any supporting documentation they have such as emails, etc." **Exhibit H.**

37. AC Buffkin on October 6 advised her officers to complete the same verification with HR prior to issuing written reprimands that she refused to complete at the request of Chief Davis on October 5 before he issued reprimands.  Rather than even contact HR or her superior officer regarding the dispute, she suspended Chief Davis for requesting verification.

38. Public records requests show that *eleven* reprimands were subsequently issued to Chief Davis' battalion employees from his original list of twelve names – five on October 8, 2021, and the remaining six issued over a month later.

39. All eleven issued written reprimands originally showed an October 2021 issue date but no HR representative signature from records requested prior to March 2022, which is required for processing and official filing of the reprimand in employee files, per county policy.

40. In addition to Defendant's admitted error in submitting employee lists for disciplinary action, Defendant further violated the MOU and federal and state law through the language of the reprimand itself.  The written reprimands stated in capitalized type: "CONSEQUENCES OF INSUFFICIENT IMPROVEMENT OR RECURRENCE MAY RESULT IN FUTURE DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION."

41. Chief Davis was subjected to a Predetermination Hearing ("PDH") on October 13, 2021, pertaining to his refusal to follow the direct order given on October 5.  He was charged with violation of his "performance of duty", "unbecoming conduct", "insubordination", and

violation of "adhering to and reporting improper orders," under OCFR rules 5, 24, 32, and 36, as well as violating a direct order and the procedures for grievance and his managerial responsibilities. Defendant found that Chief Davis engaged in "conduct in a work or non-work environment which discredits the County Government, public officials, fellow employee(s), or themselves." **Exhibit I.**

42. At the PDH, Chief Davis yet again, in writing expressed his grave concerns of the illegality of Defendant's conduct and demand that he engage in that unlawful conduct. This written defense was provided to higher command after the PDH, which was attended by two assistant chiefs and a union representative, together with Chief Davis.

43. Despite Chief Davis' properly expressing his concern under Rule 35 in disobeying an **unlawful** order, and despite AC Buffkin's violation of Rule 35, as well as Defendant's own admission of its legal error in issuing written discipline, Defendant failed to address these material facts regarding Chief Davis' conduct at any time.

44. AC Michael Howe, despite ample, written warnings provided by Chief Davis of Defendant's unlawful actions, signed in agreement by letter dated October 18, 2021 for Chief Davis' unlawful termination effective the following day, October 19, 2021. **Exhibit I.**

45. Although, according to the terms of the CBA, Defendant would have ten days in which to make a final determination after a PDH is held, Defendant through AC Howe made a very fast decision in six days, including weekend days.

46. Pursuant to later public records request production, it is clear AC Buffkin had full knowledge of the fact that Defendant was issuing reprimands to employees with pending accommodation requests, precisely the error of which Chief Davis warned. **Exhibit J.**

47. Based on AC Buffkin's actions, Chief Davis was terminated in retaliation by Defendant for his disclosure of protected information under Florida's Whistle-blower's Act and for his engaging in protected acts under state and federal law, supporting and protecting the rights of employees in his command to assert their exemptions to Defendant's vaccine mandate on religious and medical grounds.

48. Defendant's suspension of Chief Davis comes immediately after he asserted to AC Buffkin that Defendant discriminated against him because of his religious beliefs, expressed through his own religious exemption request, and only days after he filed suit against Defendant to assert his constitutional rights.  His unlawful termination followed shortly after and on the same pretextual basis as his suspension.

49. The legally and factually erroneous termination letter painting Chief Davis in a light as an insubordinate employee worthy of summary termination was copied to nine individuals within OCFR and other departments within Defendant's administration.

50. Chief Davis provided written notice of the unlawful termination and retaliation to Mayor Demings on October 19, 2021.

### *Defendant Continues to Violate State and Federal Law and Contractual Obligations, Regarding its Handling of OCFR Employee Discipline*

51. After his termination, Chief Davis submitted a Public Records Request for the discipline records of the twelve individuals under his command.  The records provided in response in mid-March 2022, showed *none of the twelve individuals in the discipline list submitted to Chief Davis* ever had their issued written reprimands processed and signed by HR.

52. Since his requests for public records were not fulfilled in their entirety by Defendant, on March 9, 2022, Chief Davis emailed Director Banks and Director Torres of the OCFR to

highlight public record inconsistencies and violations by Defendant regarding the written reprimands issued under the vaccine mandate. Director Banks, the next morning, replied stating, "I do not believe the information you were provided in response to your PRR was accurate. But I will ensure someone follows up with you promptly." That day, Chief Davis received public records of the written reprimands for his battalion.

53. On March 12, 2022, Chief Davis replied to Director Banks detailing what he believed to be "extreme ethical misconduct" within the department. And that "[t]his misconduct has led to county employees working hours upon hours to correct these unethical mistakes and negligence, which is funded directly by the taxpayers of Orange County." He indicated that one of the employees under Chief Davis' command, Lt. Dan Coats received a reprimand, despite his timely accommodation request. He also raised the point that the reprimands were improper, as they were not processed by HR with HR signature.

54. Later records requests show that after that email exchange, on March 17, 2022 many reprimands that had been unsigned by HR were signed and dated for March 17, 2022.

55. Effectively, as a result of Chief Davis' reporting of legal violations to Defendant through his chain of command, Defendant has internally admitted its violations of law and attempted to retract and cover-up its unlawful and reckless actions, albeit with additional unlawful mishandling and disposition of public records. However, Defendant refuses to reinstate Chief Davis or clear his name of the myriad erroneous charges it leveled against him.

56. One reprimand was never completed at all until Chief Davis drew attention to the record retention cover-up. Another duplicate set of reprimands exist for an employee who properly submitted his request for religious exemption to HR on September 30, 2021, and received a reply from HR, confirming the request received. However, of the two reprimands in the

records for this employee: one had blacked out the capitalized font language contrary to the terms of the MOU and was signed on October 20, 2021, two weeks after Chief Davis received the employee's name for reprimand and the day after Defendant terminated Chief Davis. The other reprimand version appeared to be the original, signed only by the employee with a date of October 7 (a replica matching signature and date are on the redacted second reprimand), and including without redaction the language contrary to MOU terms.

57. On November 30, 2021, Chief Davis had his grievance hearing regarding his challenge to his unlawful termination. He cited Defendant on eighteen (18) violations of his employment contract (CBA), County Policies, Ethics Code terms, and OCFR Standard Operating Procedures (SOP) in its unlawful and unsubstantiated, retaliatory termination of his employment.

58. Despite having many records proving Chief Davis' allegations regarding his refusal to follow unlawful orders, Defendant issued its decision on the grievance hearing quickly on December 13, 2021, asserting no analysis or assessment whatsoever, but only baldly alleging, "I find that management did not violate the collective bargaining unit articles cited in your grievance. Therefore, your grievance is denied." **Exhibit K.** Notably, though the one page decision cites all the violations raised by Chief Davis in his hearing, Chief Rathbun only asserted that the CBA terms were not violated, in his opinion.

59. On February 28, 2022, Chief Davis had his Step III grievance hearing. In similar fashion to his pre-determination hearing for discipline based on October 5, 2021 events and to his Step II grievance hearing, Defendant again concealed the records within its possession showing that Chief Davis was correct regarding the individuals on the disciplinary list who should not have received reprimand. Defendant failed to analyze Chief Davis' evidence and argument

regarding his proper compliance with his CBA and OCFR SOPs in refusing unlawful orders. The union then voted on behalf of Chief Davis to proceed to arbitration in the dispute.

60. However, sometime between the filing of this suit before the court and September 7, 2022, Defendant and Chief Davis' union IAFF Local 2057 apparently agreed upon terminating his grievance process and no longer proceeding to arbitration.  To date, Chief Davis has received no notice from Defendant regarding its refusal to pursue his grievance, no written statement from his union regarding Defendant's decision to refuse arbitration, nor any written notice regarding the union's agreement not to push for arbitration.

61. In light of the clear refusal by Defendant to address any of the voluminous evidence presented by Chief Davis regarding his appropriate questioning of the lawfulness of Defendant's actions in pursing enforcement of its vaccine mandate and issuing reprimands and Defendant's unlawful and retaliatory termination of his employment, Chief Davis opened an investigation before the Equal Employment Opportunity Commission (EEOC) on or around July 26, 2022, basing his claims in retaliation prohibited by law.

62. On September 20, 2022, the EEOC issued Chief Davis a Right to Sue Notice.

63. To date, Chief Davis has not received any response in explanation, exoneration, apology, or reinstatement as a result of proof of Defendant's misconduct, malfeasance, misfeasance, abuse, gross neglect of duty, probable mishandling or destruction of public records, and other legal and regulatory violations by Defendant related to its unlawful termination of Chief Davis.

## COUNT I

### Violation of Florida Whistle-blower's Act Fl. Stat. § 112.3187.

64. Paragraphs 1-63 are incorporated by reference herein.

65. The Florida Whistle-blower's Act prohibits an agency "from taking retaliatory action against an employee who reports to an appropriate agency violations of law." Fl. Stat. § 112.3187(2). An agency "shall not dismiss, discipline, or take any other adverse personnel action…[nor] take any adverse action that affects the rights or interest of a person in retaliation for the person's disclosure of information" identified in the Act. *Id.* at (4)(a)-(b).

66. The Act covers disclosure of information that includes:

   a.    Any violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee of an agency which creates and presents a substantial and specific danger to the public's health, safety, or welfare.

   b.    Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds…or gross neglect of duty committed by an employee or agent of an agency.

   Fl. Stat. § 112.3187(5).

67. The employee's disclosure of protected information concerning a local governmental entity, including a county entity, such as Orange County government, must be to the mayor, as a chief executive officer (Fl. Stat. § 447.203(9)) or other appropriate local officials. Fl. Stat. § 112.3187(6). The "other appropriate local officials," for OCFR include supervisors and upper management in Chief Davis' line of command.

68. The Act protects employees "who refuse to participate in any adverse action prohibited by this section" and "file any written complaint to their supervisory officials." Fl. Stat. § 112.3187(7). "Adverse personnel action" means the discharge, suspension, transfer, or demotion of any employee or the withholding of bonuses, the reduction in salary or benefits,

or any other adverse action taken against an employee within the terms and conditions of
employment by an agency or independent contractor.  §112.3187(3)(c).

69. Chief Davis was a public employee protected under the Whistleblower statute.  At all
relevant times to this complaint, Chief Davis was an employee in the supervisory position of
Battalion Chief within Defendant Orange County's Fire and Rescue Department.

70. When he accurately suspected he was being ordered to violate federal and state law to issue
written reprimands to firefighters who had timely filed for exemptions and accommodation,
he initiated the proper complaint to his commanding officer, AC Buffkin, in accordance with
OCFR Rule 35 and his collective bargaining agreement.

71. Specifically, Chief Davis suspected violations of federal and state civil rights laws,
implicating his employees' fundamental rights, if he were to discipline individuals who were
timely requesting accommodation through exemption to the vaccine mandate.  Such
violations are abusive and a gross neglect of duty by Defendant toward its employees and
would subject Defendant to liability and waste public resources in correcting the legal
violation.

72. Indeed, evidence, including Defendant's own communications through OCFR and HR public
records obtained from Defendant, vindicate Chief Davis' suspicion that Defendant was
issuing orders contrary to law.  Defendant has, in fact, never formally processed the twelve
written reprimands it commanded Chief Davis to issue to employees under his command.

73. Because Chief Davis challenged unlawful orders to his superior officer and reported his
concerns in writing through official channels, without backing down from his conviction of
their illegality, Defendant unlawfully terminated him, in violation of Fl. Stat. § 112.3187, on
October 19, 2021.

74. As a direct consequence of Defendant's unlawful termination, Chief Davis has suffered
damages through lost wages, loss of his accrued benefits and time off pay, other employment
benefits and pension, denigration of his character and impeccable employment record, and
costs in seeking future employment.

WHEREFORE, Plaintiff Stephen Davis respectfully requests that this Court enter
judgment for Plaintiff and against Defendant; and order Defendant to reinstate Plaintiff to the
same position held before his termination, or to an equivalent position and remove the unlawful
termination from his employee file; to reinstate full fringe benefits and seniority rights; to
compensate Plaintiff for lost wages, benefits, and other remuneration as proper; and enter an
award for reasonable attorney's fees and costs to Plaintiff together with any other relief the court
deems just and proper.

## COUNT II

### Retaliation under the Florida Civil Rights Act Fl. Stat. § 760.10(7).

75. Paragraphs 1-63 are incorporated by reference herein.

76. The Florida Civil Rights Act ("FL CRA") prohibits an employer "discriminat[ing] against
any person because that person has opposed any practice which is an unlawful employment
practice under this section, or because that person has made a charge, testified, assisted, or
participated in any manner in an investigation, proceeding, or hearing under this section.."
Fl. Stat. § 760.10(7).

77. Other prohibited employment practices include:

    a.      "(1)(a) To discharge or to fail or refuse to hire any individual, or otherwise to
discriminate against any individual with respect to compensation, terms,

conditions, or privileges of employment, because of such individual's race, color,

religion, sex, pregnancy, national origin, age, handicap, or marital status."

b.    "(1)(b) To limit, segregate, or classify employees or applicants for employment in

any way which would deprive or tend to deprive any individual of employment

opportunities, or adversely affect any individual's status as an employee, because

of such individual's race, color, religion, sex, pregnancy, national origin, age,

handicap, or marital status."

c.    "(2) to fail or refuse to refer for employment, or otherwise to discriminate against,

any individual because of race, color, religion, sex, pregnancy, national origin,

age, handicap, or marital status or to classify or refer for employment any

individual on the basis of race, color, religion, sex, pregnancy, national origin,

age, handicap, or marital status."

d.    "(6) to print, or cause to be printed or published, any notice or advertisement

relating to employment, membership, classification, referral for employment, or

apprenticeship or other training, indicating any preference, limitation,

specification, or discrimination, based on race, color, religion, sex, pregnancy,

national origin, age, absence of handicap, or marital status."

Fl. Stat. § 760.10.

78. Defendant is subject to FL CRA, as an employer "employing 15 or more employees for each

working day in each of 20 or more calendar weeks in the current or preceding calendar

year…."  Fl. Stat. § 760.02(7).

79. Defendant engaged in prohibited employment practices under FL CRA by imposing a covid-

19 vaccine mandate which threatened to fire and refuse to hire individuals because of their

religious belief against covid-19 vaccination and Defendant's perception of their "handicap" of lack of vaccination.

80. Defendant's mandate limited, segregated, and classified employees (and applicants) to OCFR in a way that adversely affected their employment status, threatening to terminate or refusing to hire those who were unvaccinated for covid-19 for religious reasons and because Defendant perceived these employees to be handicapped or unable to perform their job functions in their status as unvaccinated. Defendant as a result of this discriminatory, unlawful mandate did issue written reprimands to employees for their medical status as unvaccinated, including to those who had sought medical and religious exemptions. All employees discriminated against under the mandate, with and without "accommodations" were forced regularly to take invasive nasal tests, even when entirely asymptomatic for illness, further adversely affecting their status as employees.

81. Chief Davis opposed Defendant's unlawful practices pursuant to FL CRA and filed a lawsuit opposing Defendant's discriminatory and unlawful mandate.

82. Chief Davis further suspected violations of federal and state civil rights laws, implicating his employees' fundamental rights, if he were to discipline individuals who were timely requesting accommodation through exemption to the vaccine mandate. Such violations are abusive and a gross neglect of duty by Defendant toward its employees and would subject Defendant to liability for the legal violations.

83. Indeed, evidence, including Defendant's own communications through OCFR and HR public records obtained from Defendant, vindicate Chief Davis' suspicion that Defendant was issuing orders contrary to law and Defendant's knowledge that its actions were unlawful.

84. Defendant, upon learning Chief Davis' religious position in refusing covid-19 injections and after Chief Davis entered a lawsuit to challenge Defendant's unlawful mandate, rejected him for promotion to Assistant Chief, a position for which he was immensely qualified, had interviewed for the promotion, and was trained and approved to the active list for promotion.

85. When Chief Davis actively opposed Defendant's violations of FL CRA, and refused to issue unlawful reprimands to protect the rights of those under his command, Defendant unlawfully terminated him on October 19, 2021.

86. As a direct consequence of Defendant's unlawful suspension and subsequent termination, Chief Davis has suffered damages through lost wages, loss of his accrued benefits and time off pay, other employment benefits and pension, denigration of his character and impeccable employment record, and costs in seeking future employment.

WHEREFORE, Plaintiff Stephen Davis respectfully requests that this Court enter judgment for Plaintiff and against Defendant; and order Defendant to reinstate Plaintiff to the same position held before his termination, or to an equivalent position and remove the unlawful termination from his employee file; to reinstate full fringe benefits and seniority rights; to compensate Plaintiff for lost wages, benefits, and other remuneration as proper; and enter an award for reasonable attorney's fees and costs to Plaintiff together with any other relief the court deems just and proper.

### COUNT III

### Retaliation under Title VII of the Civil Rights Act of 1964, As Amended ("Title VII") 42 USC §§2000e-3(a).

87. Paragraphs 1-59 are incorporated by reference herein.

88. Title VII (42 USC § 2000e-3(a) provides that: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment,

…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

89. Other prohibited employment practices include:

   a.   "(a)(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;"

   b.   "(a)(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.."

   c.   "(2) to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin."

   42 USC § 2000e-2.

90. Defendant is subject to 42 USC § 2000e, *et seq*, as an employer employing "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year…."  42 USC § 2000e (b).

91. Defendant engaged in prohibited employment practices under Title VI by imposing a covid-19 vaccine mandate which threatened to fire and refuse to hire individuals because of their religious belief against covid-19 vaccination.

92. Defendant's mandate limited, segregated, and classified employees (and applicants) to OCFR in a way that adversely affected their employment status, threatening to terminate or refusing to hire those who were unvaccinated for covid-19 for religious reasons. Defendant, as a result of this discriminatory, unlawful mandate did issue written reprimands to employees for their medical status as unvaccinated, including to those who had sought medical and religious exemptions. All employees discriminated against under the mandate, with and without "accommodations" were forced regularly to take invasive nasal tests, even when entirely asymptomatic for illness, further adversely affecting their status as employees.

93. Chief Davis opposed Defendant's unlawful practices pursuant to Title VII and filed a lawsuit opposing Defendant's discriminatory and unlawful mandate.

94. Chief Davis further suspected violations of federal and state civil rights laws, implicating his employees' fundamental rights, if he were to discipline individuals who were timely requesting accommodation through exemption to the vaccine mandate. Such violations are abusive and a gross neglect of duty by Defendant toward its employees and would subject Defendant to liability for the legal violations.

95. Indeed, evidence, including Defendant's own communications through OCFR and HR public records obtained from Defendant, vindicate Chief Davis' suspicion that Defendant was issuing orders contrary to law and Defendant's knowledge that its actions were unlawful.

96. Defendant, upon learning Chief Davis' religious position in refusing covid-19 injections and after Chief Davis entered a lawsuit to challenge Defendant's unlawful mandate, rejected him for promotion to Assistant Chief, a position for which he was immensely qualified, had interviewed for the promotion, and was trained and approved to the active list for promotion.

97. When Chief Davis actively opposed Defendant's violations of FL CRA protecting the rights of those under his command, Defendant unlawfully terminated him on October 19, 2021. Defendant's retaliation against Chief Davis is malicious and intentional, showing reckless indifference to his protected rights.

98. As a direct consequence of Defendant's unlawful suspension and subsequent termination, Chief Davis has suffered damages through lost wages, loss of his accrued benefits and time off pay, other employment benefits and pension, denigration of his character and impeccable employment record, and costs in seeking future employment.

WHEREFORE, Plaintiff Stephen Davis respectfully requests that this Court enter judgment for Plaintiff and against Defendant; and order Defendant to reinstate Plaintiff to the same position held before his termination, or to an equivalent position and remove the unlawful termination from his employee file; to reinstate full fringe benefits and seniority rights; to compensate Plaintiff for lost wages, benefits, and other remuneration as proper; and enter an award for reasonable attorney's fees and costs to Plaintiff together with any other relief the court deems just and proper.

## COUNT IV

### Retaliation under the Americans with Disabilities Act 42 U.S.C. §12203(a).

99. Paragraphs 1-59 are incorporated by reference herein.

100. The Americans with Disabilities Act ("ADA") prohibits an employer "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. §12203(a).

101.    The ADA prohibits discrimination "against a qualified individual on the basis of

disability in regard to job application procedures, the hiring, advancement, or discharge of

employees, employee compensation, job training, and other terms, conditions, and privileges

of employment."  42 USC § 12112(a).  Such discrimination includes:

a.    "(b)(1) limiting, segregating, or classifying a job applicant or employee in a way

that adversely affects the opportunities or status of such applicant or employee

because of the disability of such applicant or employee."

c.    "(b)(2) participating in a contractual or other arrangement or relationship that has

the effect of subjecting a covered entity's qualified applicant or employee with

a disability to the discrimination prohibited by this subchapter."

d.    "(b)(3) utilizing standards, criteria, or methods of administration – (A) that have

the effect of discrimination on the basis of disability; or (B) that perpetuate the

discrimination of others who are subject to common administrative control."

e.    "(b)(6) using qualification standards, employment tests or other selection criteria

that screen out or tend to screen out an individual with a disability or class of

individuals with disabilities unless the standard, test, or other selection criteria, as

used by the covered entity, is shown to be job-related for the position in question

and is consistent with business necessity."

f.    "(d)(1) The prohibition against discrimination…shall include medical

examinations and inquiries."

42 USC § 12112.

102.    Disability is defined by the ADA as including "physical or mental impairment that

substantially limits one or more major life activities of such individual;…or being regarded

as having such an impairment…." 42 USC § 12102(1)(A) and (C). "An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 USC § 12102(3)(A).

103.    Defendant is subject to ADA, as an employer "employing 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year…." 42 USC 12111(5)(A).

104.    Defendant engaged in prohibited employment practices under the ADA by imposing a covid-19 vaccine mandate which threatened to fire and refuse to hire individuals because of Defendant's perception of their disability due to their medical status as unvaccinated against covid-19.

105.    Defendant's actions to coerce and threaten employees with termination without obtaining the covid-19 vaccination, indicates Defendant's view that receiving the injections is a necessary and essential function of OCFR employee's job duties, and that, without this treatment, OCFR employees could not complete a major life function – working.  Further, Defendant required only those unvaccinated for covid-19 to continue to wear PPE at all times and to take medical testing continuously, even when asymptomatic for any illness, indicating Defendant's view of their continuous, perpetual danger in the workplace due to their medical status.

106.    Defendant's mandate limited, segregated, and classified employees (and applicants) to OCFR in a way that adversely affected their employment status, threatening to terminate or refusing to hire those who were unvaccinated for covid-19 because Defendant perceived

these employees to be disabled and unable to perform their job functions in their status as unvaccinated. Defendant as a result of this discriminatory, unlawful mandate and by alleged contractual terms of the MOU, did issue written reprimands to employees for their medical status as unvaccinated, including to those who had sought medical and religious exemptions. All employees discriminated against under the mandate, with and without "accommodations" were forced regularly to take invasive nasal tests, even when entirely asymptomatic for illness, further adversely affecting their status as employees.

107.    Chief Davis opposed Defendant's unlawful practices pursuant to the ADA and filed a lawsuit opposing Defendant's discriminatory and unlawful mandate.

108.    Chief Davis further suspected violations of the ADA, implicating his employees' fundamental rights, if he were to discipline individuals who were timely requesting accommodation through exemption to the vaccine mandate. Such violations are abusive and a gross neglect of duty by Defendant toward its employees and would subject Defendant to liability for the legal violations.

109.    Indeed, evidence, including Defendant's own communications through OCFR and HR public records obtained from Defendant, vindicate Chief Davis' suspicion that Defendant was issuing orders contrary to law and Defendant's knowledge that its actions were unlawful.

110.    When Chief Davis actively opposed Defendant's violations of ADA, and refused to issue unlawful reprimands to protect the rights of those under his command, Defendant unlawfully terminated him on October 19, 2021.

111.    As a direct consequence of Defendant's unlawful suspension and subsequent termination, Chief Davis has suffered damages through lost wages, loss of his accrued benefits and time

off pay, other employment benefits and pension, denigration of his character and impeccable employment record, and costs in seeking future employment.

WHEREFORE, Plaintiff Stephen Davis respectfully requests that this Court enter judgment for Plaintiff and against Defendant; and order Defendant to reinstate Plaintiff to the same position held before his termination, or to an equivalent position and remove the unlawful termination from his employee file; to reinstate full fringe benefits and seniority rights; to compensate Plaintiff for lost wages, benefits, and other remuneration as proper; and enter an award for reasonable attorney's fees and costs to Plaintiff together with any other relief the court deems just and proper.

## COUNT V
## Breach of Contract

112.    Paragraphs 1-63 are incorporated by reference herein.

113.    Defendant is bound by the Collective Bargaining Agreement between Orange County Fire Fighters Association, I.A.F.F. Local 2057, and Defendant pertaining to officers "B-Unit", ("CBA") which has the authoritative weight of county ordinance. **Exhibit D.**

114.    Under the CBA, Article 6, 10, and 12, Defendant has a duty to engage in the grievance process in good faith and carefully to weigh various factors in determining appropriate disciplinary action, together with conducting an efficient and thorough investigation. Defendant further must work with the union and Chief Davis to select an arbitrator within ten working days from the notice of arbitration.

115.    Defendant breached these duties by engaging in the grievance process in bad faith and deception, withholding evidence in the form of its own public records that supported Chief Davis' allegations of Defendant's unlawful conduct and unlawful orders to him and further

public records that showed that Defendant sought to rectify its misconduct after suspending Chief Davis in retaliation. Defendant failed to conduct a fair and objective investigation, applied the rules of the OCFR unequally, and issued discipline against Chief Davis that was not commensurate to the offense alleged and his employee work record. Defendant further breached its duty under the CBA, upon information and belief, by failing to select an arbitrator timely and move forward with the grievance process after Chief Davis' Step III grievance proceeding.

116.    Defendant has a duty under Art 2 to recognize the local union as the exclusive bargaining agent for Chief Davis as battalion chief. Defendant breached this duty by making unilateral changes to the CBA terms and conditions of employment related to the disciplinary process as applied against Chief Davis without any bargaining process with the union.

117.    Defendant has a duty under Articles 3, 6, and 10 to issue discipline against covered member employees for *just cause* only. Defendant breached this contractual duty by issuing discipline against Chief Davis in the form of suspension and termination as retaliation against him, not for just cause of his own misconduct.

118.    Defendant has a duty under Article 9 to post any changes to rules, regulations, SOPs, or policy for ninety-six (96) hours prior to enforcement with disciplinary action thereunder. Defendant breached this duty by failing to post the MOU at all and failing to vet the disciplinary list provided to Chief Davis for issuance of written discipline thereunder. Defendant then retaliated against Chief Davis for his compliance with this term of the CBA and his identifying Defendant's breach.

119.    Pursuant to the CBA Articles 16 and 25, Defendant has a duty to comply with all equal employment opportunity law. Defendant breached that duty by issuing discipline to covered

employees in violation of Title VII, the ADA, and Florida's Civil Rights Act. Defendant further breached that duty by compelling Chief Davis to violate those laws through issuing an unlawful order for him to issue the unlawful discipline. Defendant also violated its duty to comply with law by instituting the vaccine mandate and segregated alternative testing scheme under the alleged MOU, and by retaliating against Chief Davis when he raised objection to these policies. Defendant's passing over Chief Davis for promotion to assistant chief after he filed a lawsuit alleging Defendant's misconduct also breached its duties under these CBA sections to comply with applicable laws.

120.    Defendant's many breaches of its duties is the proximate cause of Chief Davis' damages, including but not limited to, lost wages, loss of his accrued benefits and time off pay, other employment benefits and pension, denigration of his character and impeccable employment record, and costs in seeking subsequent employment.

WHEREFORE, Plaintiff Stephen Davis respectfully requests that this Court enter judgment for Plaintiff and against Defendant; and order Defendant to remove the unlawful termination from his employee file; to compensate Plaintiff for lost wages, benefits, and other remuneration as proper; and enter an award for reasonable attorney's fees and costs to Plaintiff together with any other relief the court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated this 8th day of November, 2022.

Respectfully Submitted,

__/s/ Rachel Rodriguez___
VIRES LAW GROUP, PLLC
Rachel Rodriguez, FL Bar # 110425
515 N. Flagler Dr., Suite P300
West Palm Beach, Florida 33401
561-370-7383 (phone/fax)
rrodriguez@vireslaw.group (email)

*Counsel for Plaintiff*


CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was filed and served utilizing the Florida

Courts E-Filing Portal on November 8, 2022 to Patricia Rego Chapman, Esq.


*/S/ Rachel L.T. Rodriguez, Esq.*

*Counsel for Plaintiff*

# EXHIBIT A

**ORANGE COUNTY FLORIDA**

## REQUEST FOR RELIGIOUS ACCOMMODATION

**Please print the following information:**

Employee Name: **Stephen M. Davis**

Email: **stephen.davis@ocfl.net**

Employee ID#: **118547**

Job Title: **Battalion Chief**

Phone #: **4074583139**

**Requested accommodation (schedule change, dress/appearance code exception, vaccination exemption, etc.):**

Vaccination Exemption

**Describe the reasons why you are requesting an accommodation (attach additional paper if necessary):**

Due to my religious convictions I respectfully decline to receive the current COVID19 Vaccine.

**Describe any alternative accommodations that might address your needs:**

These accommodations shall be addressed, if needed, under collective bargaining.

**I understand the County may request additional information in order to fully evaluate my request for religious accommodation.**

Employee signature: _____  Date: **25Aug21**


*H011 – HIPAA - COVID-19*

Revised 8/2021

**ORANGE COUNTY FLORIDA**

# REQUEST FOR RELIGIOUS ACCOMMODATION

## *Summary of Next Steps*

1. This request will be reviewed by Human Resources, in consultation with management as appropriate. Additional information may be requested.

2. After review, you will be notified of the decision regarding your request for religious accommodation.

*For Human Resources Use Only*

_____**Approved**

_____**Denied**     **Reason for denial:** _____

_____

**HR Representative Name:** _____     **HR Rep EEID:** _____

**HR Representative Signature:** _____     **Date:** _____

Revised 7/2021

# EXHIBIT B

County IAFF A & B-Unit Proposal 9-30-21

## COUNTY COVID-19 MANDATORY VACCINATION
## POLICY AGREEMENT

To address the impacts of the changes to the County Safety Manual implementing the County's mandatory COVID-19 vaccination policy, as reflected in the County's July 30, 2021 correspondence to the Union, the County and the Union agrees to the following:

1.      The deadlines for receiving the COVID-19 vaccination have been extended as follows. Bargaining unit employees shall be required to receive the Johnson & Johnson vaccine, or the first Pfizer or Moderna vaccine, and complete and submit their COVID-19 Vaccination Certification Form by September 30, 2021. Bargaining unit employees shall be required to receive the second dose of the Pfizer or Moderna vaccine, and complete and submit their COVID-19 Vaccination Certification Form by October 31, 2021.

2.      Bargaining unit employees who receive the Johnson & Johnson vaccine, or the first dose of the Pfizer or Moderna vaccine, and complete and submit their COVID-19 Vaccination Certification Form on or before September 30, 2021, shall be provided one (1) full shift off with pay. The shift off with pay must be taken by October 31, 2022, will not be paid out on separation from employment, and is subject to supervisor approval. Additionally, bargaining unit employees who received the Johnson & Johnson Vaccine, or the first does of the Pfizer or Moderna Vaccine, and submitted their COVID-19 vaccination certification on or before August 31, 2021, shall receive a $250 Lump Sum incentive paid in October 2021 or as soon thereafter as possible.

3.      Bargaining unit members shall be allowed to attain COVID-19 vaccinations, including all County required boosters, while on duty.

4.      Bargaining unit members may request a Medical or Religious accommodation/exemption to the COVID-19 vaccination. Accommodation requests must be submitted on or before September 30, 2021. Members who are granted an exemption and remain unvaccinated shall be subject to required weekly COVID-19 testing conducted in accordance with the OCFR G.O. for Testing Procedures, and other safety measures determined by management (e.g., masks while on duty).

5.      ~~Bargaining unit members who, as of the deadlines remain unvaccinated or have not submitted an accommodation request and supporting documentation, and bargaining unit members who do not submit certification of vaccination within five (5) business days of the denial of their accommodation request, shall be subject to a written reprimand. COVID-19 testing in accordance with the OCFR G.O. for Testing Procedures, and other safety measures determined by management (e.g., masks while on duty). No further disciplinary action shall be taken for failing to comply with the COVID-19 vaccination policy deadlines.~~

Bargaining unit members who do not complete and submit their COVID-19 Vaccination Certification Forms within the deadlines, who do not complete and submit their accommodation requests and supporting documentation within the deadlines, or who do not complete and submit their COVID-19 Vaccination Certification Forms within ten (10) business days of the denial of their accommodation requests, shall be subject to a written reprimand. No further disciplinary action shall be taken for failing to comply with the COVID-19 vaccination policy deadlines. This written reprimand shall not be considered or used in the bargaining unit member's performance evaluation. Additionally, such

1 of 2

bargaining unit employees shall be required to undergo weekly COVID-19 testing conducted in accordance with the OCFR G.O. for Testing Procedures, and other safety measures determined by management (e.g., masks while on duty).

6.    Bargaining unit members who fail to comply with required weekly COVID-19 testing and other safety measures determined by management (e.g., masks while on duty) shall be subject to disciplinary action as provided in the collective bargaining agreement and applicable policies, and shall not be limited to a written reprimand.

7.    This Agreement shall be non-precedent setting, and shall not be used as an interpretation of the A and B unit Collective Bargaining Agreements.

8.    The terms herein shall go into effect upon the signing of this Agreement and shall continue through the end of the County's officially declared State of Emergency, or upon mutual agreement, whichever is earlier, unless reactivated by a subsequent County officially declared State of Emergency regarding COVID-19.

9.    Unless specified herein, the terms and conditions of the A and B unit Collective Bargaining Agreements will remain intact and unchanged.

10.    By entering into this Agreement, neither party waives its positions regarding bargaining over the County's mandatory COVID-19 vaccination policy, and the Union does not waive any right to bargain over future vaccination issues.

**FOR THE COUNTY:**

Jeffrey Mandel
County Labor Counsel

9/30/21
(Date)

**FOR IAFF LOCAL 2057:**

Andre Perez
President

9/30/21
(Date)

# EXHIBIT C



2020

# Departmental Rules, Standard Operating Procedures, & Emergency Operating Procedures

**James M. Fitzgerald, Fire Chief**
**Version: 3**

ORANGE COUNTY FIRE RESCUE DEPARTMENT
6590 AMORY COURT, WINTER PARK, FLORIDA 32792
Publisher: Christopher I. Chambers, Sr.

## Mission Statement

We exist to provide life-saving and property protection delivered with compassion, respect and integrity, so that our community and visitors can enjoy a high quality of life

### Leadership Values and Principles

**DUTY**

- Be proficient in your job, both technically and as a leader
- Make sound and timely decisions
- Ensure tasks are understood, supervised, and accomplished
- Develop your people for the future

**RESPECT**

- Know your people and look out for their well-being
- Keep your people informed
- Build the team
- Employ your people in accordance with their capabilities

**INTEGRITY**

- Know yourself and seek improvement
- Seek responsibility and accept responsibility for your actions
- Set the example

### Motto

"Serving you when it matters most"





# Orange County Fire Rescue Department
## Rules Index

R.1 ...................................................................................................Knowledge of Regulations
R.2 ...............................................................................County Personnel Policies and Regulations
R.3 ......................................................................................Adhere to the Laws and Regulations
R.4 ...............................................................................................................Chain of Command
R.5 ................................................................................................................Performance of Duty
R.6 ...................................................................................................................Human Relations
R.7 ........................................................................................................Cooperation/Coordination
R.8 .................................................................................................................Reporting Violation
R.9 .............................................................................................Establishing Elements of Violation
R.10 ....................................................................................................................Emergency Recall
R.11 ................................................................................................................Gratuities and Gifts
R.12 ...............................................................................................................................Gambling
R.13 ...................................................................Identification as a Fire Rescue Department Employee
R.14 ...............................................................................................................Immoral Conduct
R.15 .........................................................................................................................Intoxicants
R.16 .........................................................................................................................Malingering
R.17 ....................................................................................................Membership in Organizations
R.18 ...............................................................................................................Personal Preference
R.19 ..............................................................................................................Reporting for Duty
R.20 ..........................................................................................................Smoking On or Off Duty
R.21 .......................................................................................................Telephone Requirements
R.22 .....................................................................................................Station Telephone Etiquette
R.23 ....................................................................................................................Truthfulness
R.24 ............................................................................................................Unbecoming Conduct
R.25 ...............................................................................................................Submitting Reports
R.26 .................................................................................................................Falsifying Reports
R.27 ...................................................................................................................Altering Reports
R.28 .........................................................................................................Security of Official Records
R.29 .....................................................................................Reporting Arrests and Court Actions
R.30 ...............................................................................................Civil Depositions and Affidavits
R.31 .....................................................................Department Representation/Conflict of Interest
R.32 ...........................................................................................................Insubordination
R.33 ...............................................................................................................Unlawful Orders
R.34 ........................................................................................................Manner of Issuing Orders
R.35 .........................................................................................................Disobedience to Unlawful Orders



## Orange County Fire Rescue Department
## Standard Operating Procedures

R.36 ................................................................Adhering to and Reporting Improper Orders
R.37 ................................................................................................Conflicting Orders
R.38 ......................................................................................................Accountability
R.39 ...........................................................................................Care of Stations/Buildings
R.40 ..................................................................................................Defacing Notices
R.41 ..............................................Apparatus, Equipment, Stations, and Orange County Property
R.42 ....................................................................Damage or Inoperative Property or Equipment
R.43 .......................................................................................................General Dress
R.44 ...............................................................................................Manner of Dress on Duty
R.45 ...........................................................................................................Civilian Attire
R.46 ...............................................................................................Authorized Ride Along
R.47 ...................................................................................................Distribution of Materials

|  | **Orange County Fire Rescue Department**<br>**Rules** |
|---|---|
| Approved | James M. Fitzgerald, Fire Chief                                    Effective Date: October 2020 |

- Commercial Testimonials

    Employees shall not permit their names or photographs to be used in endorsing any product that is service-connected with the Fire and Rescue Department without the permission of the Fire Chief, and shall not allow their names or photographs to be used in any commercial testimonial, which alludes to their positions or employment with the Department.

- Personal Publicity

    Employees shall not use their positions within the Department to enhance or promote any private enterprise, or to seek personal publicity.

- Public Appearances

    Requests for public speeches, presentations, and the like shall be routed to the affected Division Chief for approval and processing. Employees directly approached with requests of this nature shall refer the party to their division supervisors.

- Publishing Articles

    Employees, as authors or co-authors of any articles representing their positions in the Department or the policies of the Fire and Rescue Department, shall submit the article to the Fire Chief and the Public Information Office for review and approval, prior to submission of the article for publication.

**R.32    Insubordination**

Except as otherwise stated herein, defiance of a superior officer or disobedience to orders constitutes insubordination.

**R.33    Unlawful Orders**

Employees shall not knowingly issue any order that is in violation of laws, statutes, ordinances, rules and regulations, or SOPs.

**R.34    Manner of Issuing Orders**

Orders shall be issued in a clear and civil tone, in an understandable manner, and in the interest of Department business.

**R.35    Disobedience to Unlawful Orders**

No employee is expected to, or shall obey any order, that he/she knows to be contrary to federal or state law or County ordinance. At the time an unlawful order is issued, the employee shall:

- Advise the issuing authority of its illegality.

- Should that authority persist in demanding compliance, an employee of superior rank or status to all parties involved should be summoned to decide the controversy.



| | **Orange County Fire Rescue Department** **Rules** |
|---|---|
| Approved | James M. Fitzgerald, Fire Chief                    Effective Date: October 2020 |

- Responsibility for refusal to obey rests with the employee, and he/she shall be required to justify his/her actions. He/she shall, prior to the conclusion of the tour of duty in which the order was given, report the facts in writing to the Division Chief or Deputy Chief / Manager through official channels.

**R.36    Adhering to and Reporting Improper Orders**

Employees who receive orders that they feel are unjust or contrary to Department SOPs, General Orders, or Rules and Regulations, are required to obey the order.

Employees may appeal that order at the first opportunity, and prior to the conclusion of the tour of duty in which the order was given, report the facts in writing to the Division Chief or Deputy Chief / Manager through official channels.

**R.37    Conflicting Orders**

Upon receipt of an order that is in conflict with any previous order or instruction, the affected employee shall respectfully advise the person issuing the superseding order of the conflict.    Responsibility for countermanding the original instruction then rests with the individual issuing the superseding order. If the superseding command is held in force, it shall be obeyed; thereby canceling all previous orders. Orders will be countermanded only when in the best interest of the Department.

**R.38    Accountability**

Title to all uniforms and equipment purchased for and issued to employees of the Department, shall be vested in Orange County. Employees shall be held accountable for the proper care, security, use, and maintenance of all articles, uniforms, and official equipment provided.  If property is lost or damaged, the responsible employee may be subjected to reimbursement charges and/or disciplinary action pending the outcome of the investigation.

**R.39    Care of Stations / Buildings**

Employees shall not mar, mark, deface, or destroy any surface on any Department building, unless it is in the proper execution off duty with the consent of competent authority.

**R.40    Defacing Notices**

Employees shall not mark, alter, or deface any posted notice of the Department. No inflammatory, discrediting, or derogatory notices shall be posted at any time.

**R.41    Apparatus, Equipment, Stations and Orange County Property**

No apparatus, equipment, station or tangible property of Orange County shall have anything altered, added or removed, unless written authorization is issued by the Fire Chief.

**R.42    Damage or Inoperative Property or Equipment**

Employees shall immediately report to their supervisor any loss of, or damage to, Departmental property assigned to, or used by them.  Moreover, the supervisor shall be notified of any defect or hazardous conditions found in any Departmental equipment or property.

# EXHIBIT D

# AGREEMENT BETWEEN

## ORANGE COUNTY, FLORIDA



### AND

## ORANGE COUNTY FIRE FIGHTERS ASSOCIATION

# I.A.F.F., LOCAL 2057

### (B-UNIT)



## FISCAL YEARS

# 2021-22 THROUGH 2023-24

## TABLE OF CONTENTS

**ARTICLE**

ARTICLE 1: PREAMBLE …………………………………………………………………..1

ARTICLE 2: RECOGNITION ………………………………………………………………… 2

ARTICLE 3: MANAGERIAL RESPONSIBILITY/CONFLICTS OF INTEREST …………..….3

ARTICLE 4: APPENDICES AND AMENDMENTS …………………………………….....5

ARTICLE 5: DUES DEDUCTIONS …………………………………………………...6

ARTICLE 6: MANAGEMENT RIGHTS …………………………………………………...7

ARTICLE 7: UNION BUSINESS …………………………………………………….....9

ARTICLE 8: SEVERABILITY ……………………………………………….....11

ARTICLE 9: RULES AND REGULATIONS ………………………………….…….....12

ARTICLE 10: DISCIPLINE ……………………………………………………………13

ARTICLE 11: STRIKES ………………………………………………………………...15

ARTICLE 12: GRIEVANCE AND ARBITRATION PROCEDURES …………………………16

ARTICLE 13: BULLETIN BOARDS ……………………………………………………...20

ARTICLE 14: WORK IN CERTAIN HIGHER CLASSIFICATIONS …………………………21

ARTICLE 15: EMPLOYEE DRUG AND ALCOHOL TESTING PHYSICALS …..………...22

ARTICLE 16: EQUAL EMPLOYMENT OPPORTUNITY/HARASSMENT …………………26

ARTICLE 17: TRANSFERS ……………………………………………………………………27

ARTICLE 18: INSURANCE ……………………………………………………………………28

ARTICLE 19: WAGES AND INCENTIVES …………………………………………….......31

ARTICLE 20 TOBACCO USE ……...........................................................................................37

ARTICLE 21: SAFETY AND HEALTH ……………………………….……………………38

ARTICLE 22: SENIORITY/LONGEVITY …………………………………………………..39

A R T I C L E    2 3 :    H O U R S    O F    W O R K    A N D    W O R K -
BACK………………………………………….40

ARTICLE 24: RECERTIFICATION AND MANDATORY TRAINING ………………………42

ARTICLE 25: PREVAILING RIGHTS ………………………………………………………43

ARTICLE  26:  VOTING  …………………………………………………………………………
44

ARTICLE  27:  PROFESSIONAL  COUNSELING  …………………………………………………
45

ARTICLE 28: UNIFORMS AND EQUIPMENT ……………………………………………46

A R T I C L E   2 9 :   R E P L A C E M E N T   O F   P E R S O N A L   P R O P E R T Y
………………………………..47

ARTICLE 30: LAYOFF/REDUCTION IN CLASSIFICATION ………………………………48

ARTICLE 31: BENEFITS AND LEAVE ………………………………………………………49

A R T I C L E        3 2 :        O U T S I D E        E M P L O Y M E N T
…………………………………………………..52

ARTICLE 33: MODIFIED TEMPORARY DUTY AND MEDICAL SEPARATION ……..........53

ARTICLE 34: EDUCATIONAL ASSISTANCE ……………………………………………..56

A R T I C L E    3 5 :    S A V I N G S    C L A U S E …………………………………………………………..57

ARTICLE 36: ENTIRE AGREEMENT/DURATION …………………………………………..58

**ARTICLE 1**
**PREAMBLE**

1.      This AGREEMENT is between ORANGE COUNTY, FLORIDA, hereinafter
called "the County," and ORANGE COUNTY FIRE FIGHTERS ASSOCIATION, I.A.F.F.,
Local 2057, hereinafter called the "Union."

**ARTICLE 2**
**RECOGNITION**

1.      The County recognizes the Union as the exclusive bargaining agent for all employees in the job classifications included in PERC Certification No. 1366, as may be amended by the Florida Public Employees Relations Commission.  Currently included in the bargaining unit are all employees of the Orange County Fire Rescue Department in the classification of Battalion Chief and Assistant Fire Marshal.  Employees in these classifications shall be covered by the terms of this Agreement unless excluded by mutual agreement of the parties, or excluded from the bargaining unit by PERC. All other County employees are excluded from the bargaining unit and shall not be covered by the terms of this Agreement.

**ARTICLE 3**
**MANAGERIAL RESPONSIBILITY/CONFLICTS OF INTEREST**

1.      It is agreed and understood that the individuals in the bargaining unit covered hereunder are managers whose primary duties oftentimes create a conflict of interest with the employees whom they supervise.   It is, therefore, further agreed and understood that in the exercise of their supervisory duties and responsibilities, the individuals covered hereunder must, at all times while on duty, in uniform and/or while otherwise representing the County, act in the best interest of the County as determined by County Management, the Fire Chief, and other authorized management officials.  Accordingly, the individuals covered hereunder will be held accountable for the faithful and efficient performance of their managerial duties and responsibilities in accordance with their job descriptions, which may include, but not limited to, the following:

A.      Supervising a shift, battalion, work group, area, and/or a fire/rescue station and directing related operations, including the supervision of all shift, battalion, or station personnel and the oversight and maintenance of all apparatus and equipment.

B.      Supervising fire and rescue scenes and incidents in accordance with ICS (Incident Command System), including the direction of personnel and equipment as required.

C.      Assigning work duties to all subordinate personnel.

D.      Reviewing and evaluating the performance of subordinate personnel.

E.      Recommending and administering disciplinary action, conducting investigations and inquiries.

F.      Training and/or administering the training of subordinate personnel.

G.      Enforcing all County and Departmental rules, regulations, policies, procedures, and guidelines, and making recommendations concerning revisions thereto.

H.      Purchasing materials and equipment within policy guidelines and making recommendations concerning Departmental purchases.

I.      Ensuring safety of personnel within the work area and administering the Department safety program.

J.      Timely and accurately completing all forms, reports, and other paperwork relating to station operations, fire and rescue incidents, daily work and activities, and personnel matters.

K.      Temporarily transferring/assigning subordinate employees to different assignments, as required.

L.      Participating in the administration of Departmental overtime and release from duty policies.

M.      Preparing budgets for their assigned programs.

N.      Administering and participating in public education programs.

O.      Participating in committees, task forces, or other work groups as assigned by the Department or the County.

P.      Working as part of, and supporting the positions of, the Fire Administration and the County.

Q.      Performing work area inspections.

R.      Performing such other duties and responsibilities as are required under Department rules, regulations, policies, and procedures, and/or as assigned by appropriate management authority.

2.      Nothing herein shall preclude bargaining unit employees from engaging in protected union, speech, or whistle-blower activity in accordance with applicable law.

3.      Nothing herein shall render Battalion Chiefs or the Assistant Fire Marshal "managerial employees" as defined under the Florida Public Employees Relations Act. Moreover, notwithstanding the foregoing, Battalion Chiefs and the Assistant Fire Marshal shall only be disciplined for just cause.

4

## ARTICLE 4
## <u>APPENDICES AND AMENDMENTS</u>

1.      Appendices to this Agreement (if any) shall be lettered and incorporated by specific reference and shall otherwise constitute a part of the Agreement.

2.      Amendments to this Agreement (if any) shall be signed and dated by the parties and shall constitute a part of this Agreement.

## ARTICLE 5
## DUES DEDUCTIONS

1.      The County agrees to deduct from the wages on each pay period uniform bi weekly membership dues and uniform assessment, and five "Union checkoff" for each bargaining unit member who signs and submits an authorization card.  It is understood that one of the "Union checkoff" dues line may be utilized for the purpose of a PAC fund.  The County shall not make deductions for payment of initiation fees or fines.  Dues deducted by the County shall be remitted to the Union by check within seven (7) days from the date of deduction.  Any change in the amount of dues to be deducted will require a written authorization by the President and Treasurer of the Union and will be effective the beginning of the pay period fifteen (15) days from receipt of such written authorization.

2.      The payroll deduction authorized shall be revocable by any affected bargaining unit member in accordance with Florida State Statute 447.303.  The payroll deduction of Union dues and uniform assessments shall be stopped at any time by a written and dated request from such bargaining unit member delivered to the Union. The Union will initial and forward the original form to the County Payroll Department within five (5) business days after the Union receives the form.  The effective date for stopping dues checkoff shall be the beginning of the first pay period thirty (30) days after the request was stamped as received by the Union.

If, for any reason, the bargaining unit member's employment is terminated, the effective date for stopping dues checkoff shall be the date of termination.  Notice of any bargaining unit member's separation of employment from the Fire Rescue Department will be forwarded to the Union within thirty (30) days thereafter by Human Resources at Fire Rescue.

3.      No deduction shall be made from the pay of any bargaining unit member for any payroll period in which his net earnings for that period, after other deductions, are less than the amount of dues to be checked off.  Upon returning to a full pay status, after dues deductions have been stopped, such dues will re-start automatically and without further authorization from the member.

4.      The Union agrees to indemnify and hold harmless the County, its agents, employees and officials from and against any claims, demands, damages or causes of action (including but not limited to claims, etc., based on clerical or accounting errors caused by negligence), or any nature whatsoever, asserted by any person, firm or entity, based on or relating to any payroll deduction required or undertaken under this article, and agrees to defend at its sole expense any such claims against the County or its agents, employees or officials.   The term officials as used herein includes elected or appointed officials.

5.      The County's Human Resources at Fire Rescue shall forward a copy of any change of address received from union members to the Union.

6

**ARTICLE 6**
**MANAGEMENT RIGHTS**

1.      Reservation of Rights.   The County reserves and retains all rights, powers, prerogatives and authority customarily exercised by management, except as expressly limited or modified by a specific provision of the Agreement.

2.      The Union and the employees covered under this Agreement recognize and agree that the County has the exclusive right, except as specifically provided for in this Agreement, to manage and direct any and all of its operations.  Accordingly, the County specifically, but not by way of limitation, reserves the exclusive right to:

A.      Exercise complete and unhampered control to manage, direct, and totally supervise all employees of the County;

B.      Decide the scope of service to be performed and the method of service;

C.      Take whatever action may be necessary to carry out the mission and responsibility of the County in unusual and/or emergency situations;

D.      Schedule and assign the work to the employees and determine the size and composition of the work force;

E.      Determine the services to be provided to the public, and the maintenance procedure, materials, facilities, and equipment to be used, and to introduce new or improved services, maintenance procedures, materials, facilities, and equipment;

F.      Hire and/or otherwise determine the criteria and standards of selection for employment;

G.      Promote and/or otherwise establish the criteria and/or procedure for promotions, and to determine the number, grade, and types of positions, in any pay plan which is or may be developed by the County;

H.      Fire, demote, suspend or otherwise discipline for just cause;

I.      Set procedures and standards to evaluate County employees' job performance;

J.      Lay off and/or retrieve employees from duty for good cause;

K.      Determine the allocation and content of job classifications and determine all training parameters for all bargaining unit positions, including persons to be trained and extent and frequency of training;

8

L.      Use non unit employees for work performed by employees of the unit in an emergency or for special activity events when good business judgment makes such action advisable;

M.      Modify operations, temporarily or permanently, in whole or part, whenever, in the sole discretion of the County, good business judgment makes such modification advisable;

N.      Determine the number, location and operation of all departments and divisions thereof;

O.      Contract and/or subcontract any existing or future work when good business judgment makes such action advisable;

P.      Establish, amend, revise and implement any program and/or procedures; modify the structure of any County division, function or any personnel amendment to or required by any function or department;

Q.      Institute, modify or terminate any non monetary work-incentive plan;

R.      Control the use of equipment and property of the County; and

S.      Alter or vary past practices.

3.      The above rights of the County are not all-inclusive but indicate the type of matters or rights, which belong to and are inherent in the County in its general capacity as management.  Any of the rights, powers and authority that the County had prior to entering into this collective bargaining agreement are retained by the County.  The exercise of the above rights by the County does not preclude employees or their representatives from raising a grievance should decisions on the above matters have the practical consequence of violating the terms and conditions of this collective bargaining agreement.

4.      If the County fails to exercise any one or more of the above functions from time-to-time, this will not be deemed a waiver of the County's right to exercise any or all of such functions.

**ARTICLE 7**
**UNION BUSINESS**

1.       Union officers and Union representatives shall be paid by the County only when they perform assigned fire and rescue duties and/or work directed by the County.  To the extent that these employees wish to perform Union duties (such as negotiations, grievance processing, attending Union conventions, etc.) during their normal work schedules, they may utilize union pool leave, personal leave, or shift exchange; provided, however, that they comply with the rules otherwise applicable to union pool time, personal leave, or shift exchanges.

2.       The County agrees to establish a Union Time Pool not to exceed 600 hours in each fiscal year of this Agreement.  The County will contribute 300 hours to the Pool on the first day of the first full pay period after October 1 of each year of this Agreement.   The hours contributed by the County shall be maintained in the pool on an hour for hour basis.   Hours contributed by the County not used at the end of the fiscal year shall not be rolled over to any subsequent fiscal year.  240 of the hours contributed by the County shall be used exclusively for activities that benefit a member or members of this bargaining unit.

3.       Upon 80% exhaustion of the County contributed hours, the Union may request that a 2-week Union Time Pool contribution period be initiated.  Bargaining unit employees may contribute up to 300 hours of personal leave, not to exceed twelve (12) hours per employee, during this 2-week contribution period.  Only one Union Time Pool contribution period can be conducted in any fiscal year.  The hours contributed by employees will be maintained in the pool as a dollar amount using the contributing employee's base hourly rate.   Hours contributed by employees may be rolled over to a subsequent fiscal year; provided, however, that donations for the subsequent fiscal year shall be allowed only up to the point where the Time Pool contains 300 hours of leave donated by employees. Roll over hours shall be utilized during the subsequent fiscal year upon exhaustion of the County contributed hours.

4.       The Union Time Pool may be used by no more than two (2) employees per twenty-four (24) hour day for Union business.  Requests for such time off shall be in writing, using the designated Request for Withdrawal form, and shall be submitted to the Chief or his designee for approval at least forty-eight (48) hours prior to the time of such requested time off, unless circumstances beyond the Union's control warrant less notice, whereupon the request may be submitted verbally with the need for the shorter notice substantiated and later confirmed in writing.  The Chief or his designee shall notify the employee within a reasonable period of time prior to the requested time off of approval or denial of the request.  Any request which fails to comply with these requirements shall be denied.  Otherwise, approval for the use of Union Time Pool shall be withheld only upon operational need or where the granting of the request will result in overtime cost to the County.

5.       The Department shall submit the designated Request for Withdrawal form to the

Payroll Department for each bargaining unit employee requesting to use time from the pool within the deadline established by the Payroll Department.

6.      Any corrections, revisions or adjustments necessary for any reason will be made the pay period following written notification of same to the Payroll Department.

7.      The Union Time Pool hours contributed by the County shall be charged on an hour for hour basis.  The Union Time Pool hours contributed by the employees shall be charged by multiplying the hours being requested times the leave user's hourly rate of pay, and deducting that amount from the Time Pool balance.  Dollar amounts shall be rounded to the nearest whole cent.

8.      Any injury received or accident incurred by a Union member whose time is being paid for by the Union Time Pool, or while engaged in activities paid for by the Union Time Pool shall not be a considered line of duty injury, nor shall such injury or accident be considered to have been incurred in the course and scope of employment by the County within the meaning of Chapter 440, Florida Statutes, as amended.  This section shall not include benefits attainable through Florida Statutes 112.181.

9.      The Union agrees to indemnify and hold harmless the County, its agents, employees and officials from and against any claims, demands, damages or causes of action (including but not limited to claims, etc., based on clerical or accounting errors caused by negligence), or any nature whatsoever, asserted by any person, firm or entity, based on or relating to any payroll deduction required or undertaken under this article, and agrees to defend at its sole expense any such claims against the County or its agents, employees or officials.  The term officials as used herein includes elected or appointed officials.

10.     Management maintains the authority, in its sole discretion, to authorize leave with pay for union activities when it is believed to be in the best interest of the department and /or the County.  Hours authorized under this provision will not be deducted from the Union Time Pool.

11

## ARTICLE 8
## <u>SEVERABILITY</u>

      1.     If any provision of this Agreement is rendered or declared invalid by any court action or by reason of any existing or subsequently enacted legislation, the remaining provisions of this Agreement shall remain in full force and effect for the term of this Agreement.  In the event any provision of this Agreement is lawfully declared invalid, the County and the Union shall meet as soon as practicable to negotiate a replacement provision.

**ARTICLE 9**
**RULES AND REGULATIONS**

1.      Except as modified by a specific provision of this Agreement, the Orange County Policy Manual, Rules and Regulations, Administrative Regulations, Department SOP's, General Orders, or any other recognized County or Departmental Policies shall govern the employees covered hereunder.

2.      Should the County exercise its discretion to amend or modify any provisions, as stated above, it shall send by certified mail or electronic mail with read receipt, any such amendment or modification to the Union at least thirty (30) days prior to the effective date, except in cases of declared emergencies, and the Union may request impact bargaining.   All amendments or modifications shall include underlined and strike through language. The Fire Chief may on a temporary basis (no more than 30 days), implement with Union involvement when possible, an Emergency SOP when operational or administrative actions are warranted.

3.      Amendments, revisions or modifications of rules, regulations, SOP's, or policies that conflict with the terms of this Agreement are invalid unless this Agreement is likewise altered as agreed to by the parties.

4.      Employees shall comply with all applicable rules, regulations, SOP's, general orders, or policies.  No disciplinary action will be taken for violation of a posted rule, regulation, SOP, or policy until at least ninety-six (96) hours after posting.  "Posting" may be accomplished through electronic mail, telecommunication, bulletin board posting, or any other appropriate means.

## ARTICLE 10
## DISCIPLINE

1.      The Fire Chief, or his designee, may discipline any bargaining unit employee for just cause.  The types of discipline authorized under these policies include discharge, suspension without pay, demotion, written reprimands and oral reprimands.  Counseling is not considered discipline.

2.      In determining the appropriate disciplinary action, the supervisor shall take the following into consideration in each case:

A.      The seriousness and circumstances of the particular offense.
B.      The past record of the employee and his length of service.
C.      The lapse of time since the employee last required disciplinary action.
D.      The County practice in similar cases.

The parties recognize, however, that certain serious offenses will be basis for immediate discharge without regard to prior record, length of service or other considerations (such as discipline or discharge under Article 15).

3.      In the event that a suspension, demotion or discharge action is to be taken against a bargaining unit employee, he/she shall be furnished a written statement specifying the grounds that may exist for such action and the opportunity for a pre-determination hearing in accordance with applicable County/Department policy.  Bargaining unit employees may be relieved from duty with pay pending an investigation and/or disciplinary action.  An employee who is arrested may be automatically relieved from duty without pay pending criminal investigation.  If an employee is convicted of a felony, pleads nolo contendere to a felony, or if adjudication is withheld, management may, in its sole discretion, and without regard to paragraph 1 above, terminate the employee.

4.      All new hires shall serve a probationary period of one year.  Likewise all newly promoted or appointed bargaining unit employees shall serve a probationary period of one year.  Additionally, non-probationary employees may be placed on probation for either disciplinary or performance-related reasons.  Initial hire probationary employment is at will, and initial hire probationary employees may be separated from employment at any time during their probationary period based on unsatisfactory performance or for disciplinary reasons, as determined by the Fire Chief in his sole discretion.  Newly promoted or appointed probationary employees may be returned to their former position at any time during their probationary period based on unsatisfactory performance or for disciplinary reasons; and grievance for such actions may not be advanced past Step Three of the grievance provisions of this Agreement.

5.      Investigations conducted by the Fire Rescue Department into alleged employee

misconduct shall be completed within forty-five (45) calendar days of the date of the
commencement of the investigation, except where the Department determines that additional
time is necessary to complete the investigation due to circumstances beyond the Department's
control.  Investigations not completed either within forty-five (45) calendar days or within the
time extended due to circumstances beyond the Department's control shall be limited to a
discipline no more severe than written reprimand.

6.    Disciplinary actions below the level of suspension without pay shall not be
advanced past Step Three of the grievance and/or arbitration provisions of this Agreement.

7.    Bargaining unit employees shall not be subject to the County's disciplinary or
grievance/appeal procedures.  This Agreement shall establish the exclusive procedures for taking
disciplinary action as well as grievances/appeals therefrom.

15

## ARTICLE 11
## <u>STRIKES</u>

     1.     The Union and/or the bargaining unit employees shall not instigate, support, or participate in any manner in a strike against the County.

     2.     Any violation of this Article shall subject the violator to the penalties provided under F. S. Chapter 447.507, up to and including termination.

16

## ARTICLE 12
## GRIEVANCE AND ARBITRATION PROCEDURES

1.      Bargaining unit employees will follow all written and verbal orders given by superiors even if such orders are alleged to be in conflict with this Agreement.  Compliance with such orders will not prejudice the right to file a grievance within the time limits contained herein, nor shall compliance affect the ultimate resolution of the grievance.

2.      A "grievance" is defined as a dispute regarding the interpretation or application of this Agreement.  Grievances are limited to claims that are dependent for resolution exclusively upon interpretation or application of one or more express provisions of this Agreement, including any rules or regulations incorporated by reference therein.   No grievance will or need be entertained or processed which does not meet this definition, is not presented in the manner described herein, and/or is not filed in a manner provided herein within the time limit prescribed herein.  A grievance may be filed by a bargaining unit employee or the Union.  Grievances filed by a bargaining unit employee shall be limited to matters personally affecting that employee.  In either case, the procedure to be followed will be the same.  The grievant (whether it be the Union or an individual employee) and management may agree to waive Step One in any grievance. When a grievance is filed by an individual bargaining unit member, Human Resources at Fire Rescue shall immediately forward the grievance to the Principal Officers at the Union email address. The Union may, with the employee's concurrence, within ten (10) business days of the County's receipt of the original grievance, amend the original grievance and file the amended grievance with Human Resources at Fire Rescue.   The amended grievance shall replace the original grievance, and no further amendments of the grievance shall be allowed.

3.      Grievances will be processed in the following manner and strictly in accordance with the following stated time limits:

STEP ONE:  An aggrieved employee or the Union shall present in writing the grievance to the Human Resources Service Center at Fire Rescue within ten (10) working days of the occurrence of the event(s) which gave rise to the grievance on the prescribed grievance forms which shall be standard forms used throughout the grievance procedure. Upon receipt of the grievance, the Human Resources Service Center at Fire Rescue will forward the grievance to the appropriate Division Manager for a Step I determination. The grievance shall be signed by the employee and shall state:  (a) the date of the alleged events which gave rise to the grievance; (b) the specific Article or Articles and paragraphs of this Agreement allegedly violated; (c) statement of fact pertaining to or giving rise to the alleged grievance; and (d) the specific relief requested.   The Division Manager or designee shall, within ten (10) working days after receipt of the grievance, render his or her decision on the grievance in writing, with copies to the grievant (if an individual employee), the Union, the Fire Chief and the Human Resources Division.

17

STEP TWO:   Any grievance which cannot be satisfactorily settled with the Division Manager shall then be taken up by the Fire Chief or his designee.   The grievance, as specified in writing within STEP ONE above, shall be filed with the Fire Chief or his designee within ten (10) working days after the due date for the Division Manager's response in STEP ONE above.   The Fire Chief or his designee shall meet with the grievant or the union within fifteen (15) days after receipt of the grievance.   The Fire Chief or his designee, within ten (10) working days after meeting with the grievant or the union, shall render his decision on the grievance in writing.

STEP THREE:   Any grievance which cannot be satisfactorily settled in STEP TWO above shall then be taken up with the Grievance Adjustment Board by filing a request for such Grievance Adjustment Board with the Human Resources Service Center at Fire Rescue within ten (10) working days after the due date for the Fire Chief's or his designee's response in STEP TWO above.   The grievance will then be forwarded to the Human Resources Division for scheduling.   The Grievance Adjustment Board shall consist of the County Administrator, or his designee, the Union President, or his designee, and a Department Head (other than the Fire Chief), or his/her designee.   The Grievance Adjustment Board shall be scheduled within ten (10) working days after receipt of the grievance unless such scheduling is delayed as a result of the unavailability of one (or more) of the Board members.  The grievant's presentation to the Board shall be limited to the issues and request for relief set forth in the grievance filed at STEP TWO of the grievance procedure.   The majority decision of the Grievance Adjustment Board shall conclusively determine the grievance.   The proceedings of the Grievance Adjustment Board shall be recorded, and it shall be the obligation of the grievant (or his/her Union representative) to present all evidence and arguments in support of his/her position.

4.      If any grievance is not determined in STEP THREE above, the grievant may request arbitration by hand delivery or by certified or registered mail of a written notice to the County Administrator within ten (10) working days of the Board's decision (or the deadline for issuance of the Board's decision).   Said written notice of arbitration shall include a written statement of the position of the Union (or the individual grievant) with respect to the issues upon which arbitration is being sought.   The grievant's presentation at arbitration shall be limited to the issues and request for relief set forth in the ~~original~~ grievance filed at STEP ONE of the grievance procedure as may be amended in accordance with paragraph 2 above.   A bargaining unit employee shall not have the right to advance a grievance to arbitration on his/her own behalf, except if the Union declines to advance the grievance to arbitration because the employee is not a dues paying Union member.

5.      Within ten (10) working days from receipt of such notice of arbitration, the parties shall meet to select an arbitrator.   In the event the parties cannot agree on an arbitrator, the party requesting arbitration shall, within ten (10) working days, request a list of nine (9) qualified

18

arbitrators who reside within the State of Florida from the Federal Mediation and Conciliation Service. The party requesting arbitration will strike an initial name from the list of arbitrators, with the parties thereafter alternately eliminating, one at a time, from said list of names, persons not acceptable, until only one (1) remains, and this person will be the arbitrator.

6.      As promptly as possible after the arbitrator has been selected, he or she shall conduct a hearing between the parties and consider the grievance. The decision of the arbitrator will be served upon the individual employee or employees involved, the County and the Union, in writing. It shall be the obligation of the arbitrator to make his/her best effort to rule within thirty (30) working days after the hearing. The expenses of the arbitration, including the fee and expenses of the arbitrator, shall be borne equally by the parties. Any party desiring a transcript of the hearing shall bear the cost of such transcript unless both parties mutually agree to share the cost. Each party shall bear the expense of its own witnesses and of its own representatives, including attorneys, for purposes of the arbitration hearing.

7.      The arbitrator shall confine his or her consideration and determination to the written grievance presented in STEP ONE of the grievance procedure as may be amended in accordance with paragraph 2 above. The arbitrator shall have no authority to substitute his or her judgment for that of management in any area identified in this Agreement or by law as a management right, and/or change, amend, add to, subtract from, or otherwise alter or supplement this Agreement or any part thereof or amended thereto. The arbitrator shall have no authority to consider or rule upon any matter which is stated in this Agreement not to be subject to arbitration or is not a grievance as defined in this Agreement.

8.      The arbitrator may not issue declaratory opinions and shall confine him or herself exclusively to the question that is presented to him or her, which question must be actual and existing. The decision of the arbitrator shall be binding, subject to any appeal or review rights. Either party shall be entitled to seek judicial review of the arbitrator's decision in accordance with Florida law.

9.      No decision of any arbitrator or the County in any one case shall create a basis for retroactive adjustment in any other cases. All claims for back wages shall be limited to the amount of wages that the employee otherwise would have earned from the County, less any employment compensation and/or interim earnings that he/she may or might have received during the period involved.

10.     It is agreed with respect to this grievance and arbitration procedure that:

(a)     It is the intent of the parties that a grievance must be raised at the earliest possible time. Any grievance, in order to be entertained and processed, must be submitted in a timely manner by the grievant (whether the grievant is the Union or an individual employee).

19

(b)    Grievances not submitted by the grievant in a timely manner shall be conclusively barred on the merits following the expiration of the prescribed time limit.  Such a time-barred grievance need not be entertained or processed, and only facts disputed as to the timing will be subject to any arbitration resulting from the matter.  A grievance that is, for any reason, not the subject of a timely response by the County or by the Department shall be deemed denied at that step and the grievant may proceed to the next step.  The failure to proceed on a timely basis to the next step shall bar the grievance.

11.    Bargaining unit employees may not avail themselves of the grievance procedure set forth in the County's Policies.  The filing of a lawsuit or an administrative charge/complaint shall bar the filing of a grievance, and/or operate as an automatic withdrawal of a previously filed grievance, arising out of the same operative facts as the lawsuit or the administrative charge/complaint.

12.    Any grievance filed on behalf of or for the benefit of any employee or employees must specifically name all such employees, and may not be amended after completion of STEP ONE to add names.  No monetary or other relief shall be granted or awarded to any employee not so named.

13.    In all cases requiring the aggrieved employee or the Union to timely present a grievance, the grievance shall be presented via facsimile, email, or hand delivery during the hours of 9:00 a.m. until 5:00 p.m., Monday through Friday, except holidays referenced in this Agreement, to the Human Resources Service Center at Fire Rescue For those grievances submitted via facsimile or email, the grievant must simultaneously forward the original hard copy grievance form by interoffice mail.  A grievance must be advanced in person by the grievant or union during the hours outlined above.

14.    Grievance resolutions at any Step shall be implemented only after the written acceptance of the grievance decision by the grieving party or after ten (10) business days of the grievance decision if the grievant has not properly advanced the grievance to the next step, whichever occurs first.  If the resolution is accepted or the grievant has failed to advance the grievance within the prescribed timeframe, the grievance shall be barred from moving to the next Step of the grievance and/or arbitration process.  Grievance resolutions at any Step shall not be precedent setting unless the Union and County agree in writing that it will be precedent setting.

## ARTICLE 13
## BULLETIN BOARDS

1.      The Union will have the use of the existing Local 2057 bulletin board at each station in which its members regularly work, and existing Local 2057 bulletin boards to support each Division work location at Fire and Rescue's Administrative offices, and at training and other remote sites.

2.      All materials to be placed on the bulletin boards by the Union will be signed by the Union President or his designee.  Copies of any material will be delivered to the Fire Chief or his designee for approval within forty-eight (48) hours prior to actual posting.

3.      Material placed on the bulletin board shall pertain only to Union business and activities and shall not contain anything political, controversial, or anything reflecting negatively upon the County, any of its employees, elected officials or officers, its constituents or independent agencies, and shall not, in any event, violate the provisions of the County's Code of Conduct.  No material, notices, or announcements that violate the provisions of this section shall be posted.  These same rules shall apply to any postings on the Intranet electronic bulletin board.

**ARTICLE 14**
**WORK IN CERTAIN HIGHER CLASSIFICATIONS**

1.　　Management has the right to assign any employee to work in a higher classification. Bargaining unit employees who are required to work in the classifications of Assistant Chief or Fire Marshal will be paid extra compensation consisting of $100 per shift after the completion of eight (8) consecutive hours worked in the higher classification on a 24-hour shift, and after the completion of five (5) consecutive hours worked in the higher classification on an 8-hour shift.

2.　　Bargaining unit employees who are assigned to work in the classification of Division Chief will be paid additional extra compensation consisting of $120 per shift upon after the completion of eighty (80) consecutive hours actually worked as a Division Chief.

## ARTICLE 15
## EMPLOYEE DRUG AND ALCOHOL TESTING & PHYSICALS

1.        The County and the Union mutually agree that employee substance and alcohol abuse constitutes a danger to the employee, fellow employees, and the general public. It is further agreed that the safety of public property and equipment is placed in jeopardy if an employee is under the influence of a controlled substance, narcotic, drug or alcohol. Furthermore, the Union and the County will work together to provide a drug-free workplace as defined under Florida Statute 440.102.   It is further understood that if the above-referenced statute is amended or changed in any manner that the impact shall not automatically be passed on to the employee.

2.        To allay public concerns regarding substance and alcohol abuse by Public Safety employees and to mitigate the danger to other employees in the work place and to citizens generally, the County and the Union mutually agree that the following provisions will be implemented:

A.        The Fire Chief or his designee may order an employee to submit to any type of toxicology or alcohol testing deemed appropriate under any of the following circumstances:  (1) upon reasonable suspicion that an employee has been on duty or has reported for duty with any controlled substance, narcotic, drug or alcohol in his/her system; (2) if an employee has been arrested for any drug related offense; (3) upon a motor vehicle accident or workplace injury; or (4) pursuant to random selection process.  Thereafter, the provision of paragraphs B, C, D, and E, below, shall apply.  For the purpose of this paragraph the term "reasonable suspicion" shall mean a belief on the part of the Fire Chief, or designee, that the information upon which the suspicion is based is reliable.  For documentation purposes, this information shall be reduced to writing at the time of the order to submit to testing. Employees shall be selected for random testing in such a manner as to ensure that each employee will have an equal chance of selection.

B.        In the case where an employee is operating a Fire Rescue Department vehicle that is involved in an accident, the employee will be given the option of reporting to a County approved medical clinic for drug and alcohol testing or to participate in an on-site drug detection processes, referred to as a "drug swipe" and on-site breathalyzer.  The swipe is a non-invasive process administered by a designated Safety Officer, to render a preliminary drug screen result.  An on-site breathalyzer is administered, by a designated Safety Officer, to render a preliminary alcohol screening.  If the results of the two on-site tests are "non-reactive," the employee will be returned to duty with no further testing required.

23

If the result of the drug swipe or the on-site breathalyzer are "reactive" which shows a presumptive indication of drugs or alcohol in the system, the employee shall be transported to and from a County approved medical facility for confirmation testing consistent with this article. An on-site breathalyzer result of 0.02 or greater shall be considered "reactive."

Confidentiality will be maintained on a reactive swipe result to the greatest extent possible. The reactive result will be used only to determine the necessity of the employee reporting to a county approved medical facility for additional testing. Reactive results shall not be used for disciplinary purposes.  Employees requiring additional testing upon a reactive result will be placed on Relief of Duty with Pay pending results of the additional tests.

Employees who report to a County approved drug testing location shall participate in a rapid testing process in addition to the regular testing process.  If the rapid test results determined to be negative by the Medical Review Officer (MRO), no further action will be taken on the regular test, and the employees will be returned to duty.  If the rapid test results are determined by the MRO to be nonnegative, the regular testing process shall proceed in accordance with this article.

C.    Testing will be conducted in accordance with CDL regulations by a certified laboratory or agency.

D.    Upon written request from the employee, a different certified laboratory or agency will conduct a test on the second portion of the original specimen if the request is received within seventy-two (72) hours of the time the employee is notified of a positive test result on the original sample.

If requested to conduct a test on the second sample, the certified laboratory will confirm any positive test result by a gas chromatography test on the second sample of the original specimen.

E.    For alcohol testing purposes, employees will be asked to provide test samples that will be submitted to an appropriate alcohol testing procedure.  A 0.04 or greater blood/alcohol level will deem the employee to be impaired and will be considered a positive test result.  A positive test may result in disciplinary action up to and including dismissal.

F.    Employees who refuse to comply with the provisions of this Article, including but not limited to refusing to report for drug testing at the time and place directed, shall be terminated.

24

G.     In accordance with the provisions of Florida Statutes, the test results and all other medical reports shall remain confidential and are not subject to public release. However, the results and reports may be disclosed in any arbitration or litigation involving the employee.

H.     Employees may request Union representation during any of the testing procedures, provided that the Union representative does not in any manner interfere with or delay the testing procedures or jeopardize the security of the tests.

I.      The County, in its sole discretion, and without limiting its rights under sub-section J below, may provide the opportunity for employees to enter a County-approved/ sponsored rehabilitation program.  The parties agree that the County has the sole authority to determine whether to maintain and/or continue any County-approved/ sponsored rehabilitation program and that any approval for an employee to enter any rehabilitation program may be limited by the County to one opportunity during an employee's employment.  An employee may be allowed to voluntarily enter a County-approved/sponsored rehabilitation program, assuming that the employee has had no history of substance influence or use, that no disciplinary action is pending (and further that the employee has done nothing for which he could be subject to disciplinary action), and that no accident, injury, reasonable suspicion request, or random selection has occurred at the time of such request. The County and Union encourage employees to volunteer in seeking assistance by way of professional counseling.

J.      If an employee enters a County-approved/sponsored rehabilitation program in accordance with paragraph J. above, then, upon successful completion of rehabilitation (as determined by a County-designated physician) the employee shall be returned to his regular duty assignment or the equivalent thereof.   If follow-up care is prescribed after treatment, such may be imposed by the County as a condition of continued employment.  The County shall be allowed complete access to the employee's medical file and counseling records.

Immediately upon an employee's discharge from a rehabilitation program, the employee will provide the County with documentation of the follow-up care requirements as well as permission for the County to ascertain whether the employee has been and/or is abiding by the program requirements.  Moreover, the parties agree that entry into such a rehabilitation program shall be deemed to constitute reasonable suspicion that the employee has in his system or is using controlled substances, narcotics, drugs or alcohol, and that, accordingly, the employee may be subject to testing procedures in accordance with paragraphs B and C above, as required by management, for period not to exceed two (2) years

25

from the date that the employee returns to duty.  Should an employee refuse to submit to testing in accordance with the provisions of this paragraph, to voluntarily enter a County-approved/sponsored rehabilitation program, to successfully complete and otherwise comply with the requirements of such program, to comply with the requirements of any follow-up care; or, should the employee test positive for drugs or controlled substances, narcotics, or drugs or alcohol during the aforesaid two (2) years period, the employee shall be immediately dismissed.

K.    The County retains the absolute right to determine whether a single positive test result warrants discharge or a lesser disciplinary action.  The failure of the County to impose a particular disciplinary action in one situation will not prejudice the County's right to impose such (or a different) disciplinary action in another situation. Nothing in this Agreement shall be interpreted as restricting, in any way, the absolute right of the County to terminate employment for a single positive drug or alcohol test result.

L.    The County and Union agree that each employee will undergo annual drug testing as part of their annual physicals.  All employees that do not receive annual physicals will be drug tested within a two-week period of time from their anniversary date.

3.    The County maintains the right to require any bargaining unit employee, at County expense, to undergo a fitness-for-duty test (physical and/or psychological) where the County determines that cause exists for such test.

4.    As part of the Fire/Rescue Department Respiratory Protection Program, annual medical examinations will be provided to all Special Risk certified personnel.  Examinations will be paid for by the Department, will be scheduled during off-duty time, and will be compensated in accordance with this agreement.   Forty-hour employees will schedule their medical examination during working hours.

5.    Included in the annual medical examinations will be the following:

A.    Medical History
B.    Height and Weight record
C.    Vision Screening
D.    Blood Pressure and Pulse
       Audiometric Testing
E.    Pulmonary Functions Test
       12 Lead EKG
F.    Chest X Ray (Every other year unless requested)

26

G.    Blood Tests - Glucose, BUN (Urea Nitrogen), Creatinine/Serum, BUN/ Creatinine Ratio, Uric Acid/Serum, Calcium/Serum, Phosphorus/Serum, Cholesterol, Triglycerides, Total Bilirubin, LDH, Alkaline Phosphatase, SGOT, SGPT, Protein/Total Serum, Albumin, Globulin, A/G Ratio, Sodium, Potassium, Chloride, $CO_2$, Anion Gap

H.    Stress EKG will be provided every two years to personnel over the age of 40.  NOTE:  If requested by the examining physician a Stress EKG will be performed regardless of age.

I.    Physician Exam

J.    TB Test

K.    HIV test upon request

L.    Breast exam

M.    Prostate and PSA exams

N.    Ultrasound Scans (echocardiogram heart, carotid artery, aortic aneurysm, liver, pancreas, gall bladder, kidneys, spleen, abdominal organs, ovaries/ uterus, testicular/prostate, bladder, and thyroid) – odd numbered years only

6.    The primary purpose of this program is to identify and inform personnel of any possible health risks.  Employees will be notified within thirty (30) days of any abnormal finding requiring medical follow up.  All follow up medical appointments will be made during off duty time.

7.    Upon request, employees may obtain a copy of their blood test results from the medical facility.

8.    Squad and Rescue Diver physicals shall include a medical surveillance exam.

**ARTICLE 16**
**EQUAL EMPLOYMENT OPPORTUNITY/HARASSMENT**

     1.    The current County policies, and amendments thereto, regarding equal employment opportunity and harassment shall remain in effect for the term of this Agreement.

**ARTICLE 17**
**TRANSFERS**

1.      Employees may be transferred from station to station, work location to work location, shift to shift, and/or assignment to assignment as deemed to be in the best interest of the County by the Fire Chief, or his designees.

2.      Mutual consent transfers shall be allowed subject to the approval of the affected Division Chiefs.

3.      The transfer or denial of a mutual request transfer shall be appealable to the Fire Chief, but shall not be grievable.

4.      Battalion Chiefs who are assigned to a 40-hour assignment at the discretion of management (excluding light duty, non-mandatory training, or discipline-related assignments) will be paid extra compensation consisting of 7-1/2% adjustment to their base hourly rate of pay for all hours worked in a 40-hour capacity, accrued paid leave hours, union time pool, and holiday pay.  The extra compensation will not be applied to hours related to light duty, discipline-related assignments, work-back, hours spent while participating in non-mandatory training or any other time not specifically named in this Article.

5.      Management will provide bargaining unit employees with written notice of any transfers from a 56-hour assignment to a 40-hour assignment or vice versa, or from one shift to another, at least two weeks prior to the effective date of the transfer.  Transfer may be made with less than two weeks' notice when there is a critical need for the transfer, such as during disaster operations, significant threats to the community, or unanticipated changes in staffing that require immediate resolution.

## ARTICLE 18
## <u>INSURANCE</u>

1.      The County will make available health and welfare insurance programs on a group basis to unit employees to the same degree that such insurance is provided to other County employees.  The County reserves the right to terminate the group insurance program or any part thereof at any time with prior notice to the Union.

2.      The health insurance program will be optional to all eligible employees who will pay a proportionate share, as determined from time-to-time by the County, of each bi weekly or other premium through deductions from payroll.  The County reserves the right to reduce or enlarge the benefits payable under any coverages, to alter or cease any coverages, to raise or lower any "out of pocket" amounts and to raise or lower any deductibles.

3.      The County reserves the right to make any changes in the cost of any of the insurance or its contribution level.

4.      It is agreed that, in the event of a premium increase or other increase in the cost to the County of providing any of the insurance, such increase will be paid by the employees in the same proportion to the County's contribution in which such affected employees presently pay for such coverage, or in any other proportion as determined by the County under this Article.  Such increases shall be deducted from wages and shall be administered in the manner presently in effect.

5.      The Union will be notified of any change in insurance carriers, nature or scope of coverage or amount of coverage and of increased amounts to be paid by employees under the Article.

6.      No employee may be a member of more than one County approved medical plan at a time.  The County shall pay a portion of the plan.  Such portion is to be discretionary with the County and subject to change at the County's discretion.   The Union agrees that any insurance plan offered herein may make any change or alteration in cost, coverage, benefits, amounts thereof or any other characteristics, all such changes being beyond the County's control.

7.      Participating employees may make changes to their insurance elections if they experience a family status change as outlined in the Wellness for Life Plan.  The employee has 30 days from the day the family status change occurs to notify the Benefits Section of the change.

8.      The County agrees that certain employees, or surviving dependents of deceased or injured employees, may continue their group medical insurance coverage under the following conditions:

A.      Upon the in line of duty death of an employee, the surviving dependents shall receive medical coverage at no cost until such time as the surviving spouse remarries, a child reaches age 26 or, if covered on the TRICARE Supplement Plan is unmarried and reaches age 21 (age 23 if a full-time student): a child of a covered dependent child (grandchild) reaches the age of 18 months; a disabled child marries or is no longer dependent on the surviving spouse for support. Additionally, the surviving dependents may continue vision and dental coverage premium free providing certain conditions are satisfied, in accordance with the County's insurance policy.

Upon the non in line of duty death of an employee, group medical coverage for surviving dependents may be continued for one (1) year from the date of the employee's death.

As per County policy, in regards to employee deaths, annual base compensation rate will include total compensation.

The surviving dependents may have the right to continue medical, dental and vision coverage beyond the premium free period or when their dependency status changes under the Consolidated Omnibus Budget Reconciliation Act of 1986 COBRA.    Under COBRA, the surviving dependent would be responsible for payment of premiums plus a 2% administrative cost.

B.      Employees who retire may continue their group medical insurance coverage.  The retiree will pay the full premium.  To assist in this cost, the County will provide a monthly subsidy to retired employees who have retired from service under the Board of County Commissioners and are receiving Florida Retirement System benefits.    The monthly subsidy will begin after the Human Resources benefits department has received proof that the employee has health insurance.    Subsidy payments are not retroactive.  The subsidy will provide $3.00 per month for every year of service to a maximum of 30 years; up to the cost of the employee premium, whichever is lower.

For those employees forced to retire by the County due to an illness or injury from which a workers' compensation award has been issued, the subsidy will provide $5.00 per month for every year of service to a maximum of 30 years, up to the cost of the employee premium, whichever is lower.  The minimum subsidy

shall be $75 per month.  Employees will be eligible for only one of the subsidy rates stated above.

Fiscal Year 2022-23

This subsidy will provide $4.00 per month for every year of service to a maximum of 30 years, up to the cost of the employee premium, whichever is lower.

Fiscal Year 2023-24

The subsidy will provide $5.00 per month for every year of service to a maximum of 30 years, up to the cost of the employee premium, whichever is lower.

C.      Employees who are disabled because of an illness, not related to County employment, may continue their group insurance coverage while covered by approved Family and Medical Leave.   The employee's portion of insurance premium will continue to be deducted while leave time is available.   If the employee exhausts all leave balances while covered by approved Family and Medical Leave, the employee may pay his~~/her~~ portion of insurance premium directly to payroll to continue the coverage.

If an employee is on leave without pay beyond Family and Medical Leave or other personal reasons not related to County employment, the employee will be offered COBRA to continue group medical insurance.

D.      Employees who are disabled because of illness or catastrophic in line of duty injury may continue their group insurance coverage.  Coverage for the injured employee, injured employee's spouse and for each dependent child of the injured employee shall be in accordance with Florida Statute 112.191.

9.      Any employee or retiree who wishes to continue the insurance coverage as provided in paragraph 8 must contact the Human Resources Division to apply for the continued coverage and to make the necessary arrangements for the payment of the required premiums.

Such contact with the Human Resources Division must be in writing within thirty (30) calendar days following the date of death, retirement or placement on leave of absence without pay.

10.     All of the benefits granted in paragraph 8 and all of the agreements made pursuant to paragraph 8 by the County are expressly conditioned upon, subject to and limited by all rights granted to and reserved by the County in this Article.

11.     The Union shall have a representative on the Employee Benefits Committee, which is charged with the responsibility of developing the recommendations for benefits to be presented to the Board of County Commissioners for approval.

12.     In the event of the death of an eligible bargaining unit employee, the County shall deduct $25 from the net pay of each bargaining unit employee who has provided the County a written authorization for the deduction.  This deduction shall occur in the first full pay period after the County is notified by official letter from the Union advising of an eligible bargaining unit employee's death.  An eligible bargaining unit employee is defined as an employee who has an official written authorization for the deduction on file with the County. The County shall remit the monies collected to the Union and the Union shall bear sole responsibility and liability for forwarding the monies to the deceased bargaining unit employee's designated beneficiary and/or estate, as appropriate.

Upon implementation of this contract and thereafter upon initial hire, all bargaining unit employees will be provided a one-time opportunity to provide their written authorization for the $25 deduction.  The authorization may be revoked by providing written notice to the County & Union.  No other opportunities to provide written authorization will be provided.  The County may at its sole discretion substitute the written authorization with an electronic acknowledgement.

## ARTICLE 19
## <u>WAGES AND INCENTIVES</u>

1.    Bargaining unit employees shall receive wage increases, as follows:

A.    Fiscal Year 2021-22

Effective October 3, 2021, or the date of approval by the Board, whichever is later, all eligible B-unit bargaining unit employees in the bargaining unit as of that date and continuing to be in the bargaining unit, on active payroll, through the first full pay period after the date of Board approval of this Agreement who have not previously received a 2021-22 wage increase shall receive a 4% Base Wage increase. Those employees at or near the maximum of the pay range will receive a one-time lump sum, not added to their Base Wage, in an amount equal to the difference between the 4% pay increase and amount bringing the employee to the range maximum but no more than a total of 4%. If the Agreement is ratified by the bargaining unit employees before October 3, 2021, retroactive wages will be paid. If the Agreement is ratified by the bargaining unit employees on or after October 3, 2021, there will be no retroactive wages paid. In such instance, the Wage Increase will be paid prospectively only once the Agreement is approved by the County (Board of County Commissioners). Employees entering into the bargaining unit on or after the effective date reference in this paragraph will not be eligible for the wage increase.

Retroactivity, if any, will occur only to those active employees under this Agreement as of the first full pay period after the date of Board approval of this Agreement. The retroactive portion of the base wage increase will be paid in a lump sum to those employees in the bargaining unit as of October 3, 2021 and continuing to be in the bargaining unit, on active payroll in this bargaining unit (the B unit) upon implementation. This retroactive portion of the base wage increase will be calculated by multiplying the sum of Fiscal Year 2021-22 base wages only (consisting of salary and overtime), while in a bargaining unit position under this Agreement from the first full pay period in Fiscal Year 2021-22 through the last full pay period prior to implementation by the appropriate percentage as outlined.

B.    Fiscal Year 2022-23

Effective October 2, 2022, all eligible B-unit bargaining unit employees on the active payroll shall receive a 4% Base Wage increase. Those employees at or near the maximum of the pay range will receive a one-time lump sum, not added to their Base Wage, in an amount equal to the difference between the 4% pay increase and amount bringing the employee to the range maximum but no more

34

than a total of 4%.

C.    Fiscal Year 2023-24

Effective October 1, 2023, all eligible B-unit bargaining unit employees on the active payroll, shall receive a 4% Base Wage increase. Those employees at or near the maximum of the pay range will receive a one-time lump sum, not added to their Base Wage, in an amount equal to the difference between the 4% pay increase and amount bringing the employee to the range maximum but no more than a total of 4%.

D.    Future Increases

Any future increases to employee base wages or incentives beyond Fiscal Year 2023-24 shall be negotiated.

2.    Fire Rescue employees promoted to Battalion Chief or Assistant Fire Marshal shall receive a 7.5% increase on their Base Wages not to exceed the maximum of the pay range. A Unit incentives, other than A Unit Longevity, shall not be included in Base Wages. Fire Rescue Department employees promoted to Battalion Chief or Assistant Fire Marshal shall have their balance of any accrued Leave Hours/days carried over, in accordance with existing practice.

3.    Each Fiscal Year, bargaining unit employees who have completed one full year of service as a Battalion Chief or Assistant Fire Marshal shall receive a special risk emergency response longevity adjustment of $0.26 (56 hour employees)/$0.37 (40 hour employees) per hour added to their Base Wage, not to exceed the maximum of the pay range, effective on the first full pay period after their B unit anniversary date.

Layoffs or authorized leaves of absence without pay shall not constitute a break in service; however, any time lost in these occurrences shall not be counted as time worked for calculating years of service unless the employee returns to work in their former position within one year of layoff and longevity shall be bridged. If the bargaining unit employee is at or near the maximum of the pay range, the seniority incentive shall be reduced to an amount that will place the bargaining unit employee at the maximum of the pay range.

4.    Bargaining unit employees who are qualified and licensed as paramedics under all State and local requirements, including Orange County Fire Rescue requirements, shall receive paramedics incentive pay in accordance with the following paramedic incentive pay rate table for each hour or portion thereof worked including any hours of paid sick leave, paid vacation, paid

military leave, work in a higher classification, or any paid hours (other than Work-Back) used during any pay period for the term of this Agreement.   Bargaining unit employees shall automatically forfeit their paramedic incentive pay upon no longer being qualified and licensed as paramedics under all State and local requirements, including Orange County Fire Rescue requirements.

| Paramedic Certification Pay | | | |
|---|---|---|---|
| 56 Hour Employee | | 40 Hour Employee | |
| Hourly | Annually | Hourly | Annually |
| Same as A Unit | Same as A Unit | Same as A Unit | Same as A Unit |

5.    Bargaining unit employees who are qualified as Paramedic Preceptors shall receive paramedic preceptor qualification incentive pay in accordance with the following paramedic incentive pay rate table for each hour or portion thereof worked including any hours of paid sick leave, paid vacation, paid military leave, work in a higher classification, or any paid hours (other than Work-Back) used during any pay period for the term of this Agreement. To be qualified as Paramedic Preceptor personnel must meet the following requirements:

A.    Pass the written test as determined by the testing agency.

B.    Must have served as paramedic for the Orange County Fire Rescue Department for three (3) continuous years.

C.    All Preceptors must complete all training and courses that may be required by the department.

D.    Must precept paramedics or EMT's as required by the Fire Department.

E.    Must provide in-service instruction and training as deemed necessary by the Fire Rescue Department.  Failure to meet established standards will result in loss of preceptor pay.

Bargaining unit employees shall automatically forfeit their incentive pay upon no longer being qualified.

| Paramedic Preceptor Qualification Pay | | | |
|---|---|---|---|
| 56 Hour Employee | | 40 Hour Employee | |
| Same as A unit | Same as A unit | Same as A unit | Same as A unit |

6.    Effective October 3, 2021, or the date of approval by the Board, whichever is later, bargaining unit employees who possess the following qualifications, certifications, and/or education shall receive, up to four (4) of the below incentive pays in accordance with the following Qualification Pay rate table for each hour or portion thereof worked including any hours of paid sick leave, paid vacation, paid military leave, work in a higher classification, or any paid hours (other than Work-Back) used during any pay period for the term of this Agreement. Bargaining unit employees shall automatically forfeit their incentive pay upon no longer being qualified.  If the Agreement is ratified by the bargaining unit employees before October 3, 2021, retroactive incentives will be paid. If the Agreement is ratified by the bargaining unit employees on or after October 3, 2021, there will be no retroactive incentives paid.

| Incentive Pay | | |
|---|---|---|
| | **56 Hour Employee** | **40 Hour Employee** |
| | | |
| Squad Technician Qualification Pay | Same as A unit amount | Same as A unit amount |
| Truck Technician Qualification Pay | Same as A unit amount | Same as A unit amount |
| Rescue Climber Qualification Pay | Same as A unit amount | Same as A unit amount |
| Rescue Diver Qualification Pay | Same as A unit amount | Same as A unit amount |
| State Certified Fire Instructor III Certification | $.50 | $.70 |
| Chief Fire Officer Designation (Public Safety Excellence) | $.50 | $.70 |
| State Certified Fire Officer III Certification | $.50 | $.70 |
| Executive Fire Officer (NFA) | $.50 | $.70 |
| Master's Degree | $.50 | $.70 |

7.    Assistant Fire Marshals permanently assigned to the Office of the Fire Marshal (OFM) who attain the following certifications shall be eligible for certification incentive pay as detailed below:

- National Fire Protection Association Certified Fire Plan Examiner

- State of Florida Firesafety Inspector II

37

☐ Fire and Life Safety Educator I (Only available for members receiving the certification pay as of March 26, 2017)

☐ NFPA Certified Fire Protection Specialist (CFPS)

☐ State of Florida Certified Fire and Life Safety Educator

☐ Certified Fire Protection Specialists (CFPS)

☐ Certified Water-Based Systems Professional (CWBSP)

Effective October 3, 2021, or the date of approval by the Board, whichever is later. Assistant Fire Marshals shall receive certification incentive pay of $0.50 per hour ($1,040.00/Annually) for each certification, up to the limit below for each hour or portion thereof worked including any hours of paid sick leave, paid vacation, paid military leave, work in a higher classification, or any paid hours (other than Work-Back) used during any pay period for the term of this Agreement. Assistant Fire Marshals shall not be eligible to receive certification incentive pay for more than three (3) of the above listed certifications, and their total certification pay shall be limited to $1.50 per hour ($3,120.00/Annually). Loss of or failure to recertify any of the certifications shall result in loss of that incentive amount. If the Agreement is ratified by the bargaining unit employees before October 3, 2021, retroactive incentives will be paid. If the Agreement is ratified by the bargaining unit employees on or after October 3, 2021, there will be no retroactive incentives paid.

NFPA certifications must be through the NFPA and contain certification dates.

The Assistant Fire Marshals are responsible for the costs associated with obtaining certifications and all recertification costs associated with this Article. However, for eligible expenses, the Assistant Fire Marshals may avail themselves of the County's Training and Development program as outlined in the Orange County Policy Manual and Operational Regulations.

8.      The parties agree that employees are responsible for thoroughly reviewing and approving their employee timecards for each pay period following standard operating procedures. The parties further agree that this assists with preventing both underpayments and overpayments. In cases where it is determined that an overpayment occurred, the County will notify the employee

38

of the overpayment at the earliest date possible. The County will show sufficient detail that the overpayment occurred.

The Comptroller's Payroll Office will work with the employee to establish a repayment plan until the debt is repaid, or payment of the full amount from the final paycheck if the employee is separating from employment. The comptroller's final decision on the repayment schedule shall not be grievable.

## Rate Appendix for Fiscal Years 2021-22

| Job Code | Job Title | Pay Grade | Annual Minimum | Annual Maximum |
|----------|-----------|-----------|----------------|----------------|
| 4557 | BATTALION CHIEF 40 HOUR REG | 327 | $85,066.80 | $122,149.87 |
| 4556 | BATTALION CHIEF 40 HOUR SRK | 327 | $85,066.80 | $122,149.87 |
| 4563 | BATTALION CHIEF 56 HOUR SRK | 328 | $85,081.50 | $122,157.32 |
| 4611 | ASSISTANT FIRE MARSHAL 40 HOUR | 327 | $85,066.80 | $122,149.87 |

## Rate Appendix for Fiscal Year 2022-23

| Job Code | Job Title | Pay Grade | Annual Minimum | Annual Maximum |
|----------|-----------|-----------|----------------|----------------|

| 4557 | BATTALION CHIEF 40 HOUR REG | 327 | $87,193.47 | $125,203.62 |
| 4556 | BATTALION CHIEF 40 HOUR SRK | 327 | $87,193.47 | $125,203.62 |
| 4563 | BATTALION CHIEF 56 HOUR SRK | 328 | $87,208.54 | $125,211.25 |
| 4611 | ASSISTANT FIRE MARSHAL 40 HOUR | 327 | $87,193.47 | $125,203.62 |

## Rate Appendix for Fiscal Year 2023-24

| Job Code | Job Title | Pay Grade | Annual Minimum | Annual Maximum |
|---|---|---|---|---|
| 4557 | BATTALION CHIEF 40 HOUR REG | 327 | $89,373.31 | $128,333.71 |
| 4556 | BATTALION CHIEF 40 HOUR SRK | 327 | $89,373.31 | $128,333.71 |
| 4563 | BATTALION CHIEF 56 HOUR SRK | 328 | $89,388.75 | $128,341.53 |
| 4611 | ASSISTANT FIRE MARSHAL 40 HOUR | 327 | $89,373.31 | $128,333.71 |

**ARTICLE 20**
**TOBACCO USE**

1.      It is understood that smoking and/or the use of any and all tobacco products is a known hazard to the health of employees, including members of the bargaining unit.   The purpose of this article is to reduce the number of health insurance claims related to the use of tobacco products.   It is agreed that the following policy regarding the use of tobacco products shall be adhered to.

2.      All bargaining unit members hired on or after October 1, 1989, shall be non-tobacco users at the time of hire as a condition of employment and shall be required, as an absolute condition of continued employment, to refrain from smoking cigarettes, cigars, pipes, or use of any type tobacco products of any kind at all times, whether on or off duty.  All bargaining unit members promoted to Battalion Chief on or after October 1, 2002, shall be non-tobacco users at the time of promotion as a condition of employment and shall be required, as an absolute condition of continued employment, to refrain from smoking cigarettes, cigars, pipes, or use of any type tobacco products of any kind at all times, whether on or off duty.  Any bargaining unit member who violates this provision will be subject to disciplinary action.

40

3.     All bargaining unit members hired before October 1, 1989, including those promoted to Battalion Chief before October 1, 2002, shall be permitted to use tobacco on duty only in designed smoking areas.  Smoking and the use of tobacco products shall be prohibited when in contact with the general public; in all fire/rescue vehicles; and in areas of the fire department and County facilities, except for designated smoking areas.  Any bargaining unit member who violates this provision will be subject to disciplinary action.

4.     Bargaining unit employees may be subject to tobacco testing.

## ARTICLE 21
## SAFETY AND HEALTH

1.      The County and the Union will cooperate in the continuing objective of eliminating accidents and health hazards.  The County and the Union will cooperate in the enforcement of safety rules and regulations and shall promote sound safety practices for the protection of employees.

2.      The Union may consult with the County's safety representative and make recommendations in safety matters.

3.      All protective devices, wearing apparel, and other equipment deemed reasonable and prudent by the Orange County Fire Rescue Department to protect employees from injury shall be provided by the County.   Such protective devices, apparel and equipment, when provided, must be used.  The Union agrees that neglect or failure by an employee to obey safety regulations or to use or maintain the safety equipment furnished hereunder by the County shall be basis for disciplinary action up to and including discharge.  Additionally, an employee who loses or damages County or Department devices, apparel, or equipment of any type, due to gross neglect or intentional acts, shall reimburse the County for the cost thereof, or the cost of repairing the item (assuming it can be repaired by the County/Department), up to $500.

4.      The County and the Department will maintain such health and safety conditions as are required under applicable federal, state, and local law.   Battalion Chiefs shall be responsible for enforcing safety and health requirements adopted by the Department.

5.      Bargaining unit members may be required to take and pass an annual physical abilities test, the timing and content of which shall be determined by the Fire Chief or his designee with prior input from the Union.

# ARTICLE 22
## SENIORITY/LONGEVITY

1.    LONGEVITY:  Longevity, for the purpose of this Agreement, is defined to be the length of continuous uninterrupted service in the Orange County Fire Rescue Department, including any continuous uninterrupted service as firefighters of the abolished Fire Control Districts.  Longevity continues to accrue during all types of leave.

Exception:  When a member is on leave of absence without pay for a period exceeding thirty consecutive days.  The total time accumulated over the 30-day period shall not be counted toward longevity accrual.  Leave of absence without pay for periods of 30 days, or less, shall not cause an adjustment in longevity accrual.   Longevity is used to calculate certain benefits attributable to the member which benefits are based on accrual rates.

2.    SENIORITY:   Seniority for the purpose of this Agreement is defined to be the accumulated length of service in a rank or classification, as covered by this Agreement.  It is not necessary that the accumulated service is consecutive, that is without break.  Seniority continues to accrue during all types of leave.

Exception:  When a member is on leave of absence without pay for a period exceeding thirty consecutive days.  The total time accumulated over the 30-day period shall not be counted toward seniority accrual. Leave of absence without pay for periods of 30 days, or less, shall not cause an adjustment in seniority accrual.

When more than one member accumulates the same length of service, seniority in a rank or classification determines the order.   In the event seniority is identical, the longevity, as described above shall be used to determine the outcome.  In the event seniority or longevity are the same, then the affected members shall draw lots to determine the outcome.  Administration of the lot drawing shall be by the Union.   Seniority begins on the date of hire, or promotion. It ceases in that rank, or classification, on the date of promotion to a new rank, or classification, and shall be kept in each member's Fire Department personnel record.  Seniority, as referred to in this contract, shall be used in the determination of vacation scheduling and any other procedures referenced in this Article relating to seniority.   Nothing in this provision shall be construed to effect negatively employees acquired through the consolidation of departments.

## ARTICLE 23
## HOURS OF WORK AND WORK-BACK

1.      Bargaining unit employees are primarily responsible for performing non-manual work directly related to management policies or the general operations of the Department, or are primarily responsible for managing a unit within the Department, including the supervision of two or more employees. Bargaining unit employees also regularly exercise discretion and independent judgment in performing their job duties.  Moreover, bargaining unit employees are paid on a salary basis, and that nothing in this Agreement is intended to convert the bargaining unit employees to hourly employees.  It is therefore understood and agreed that bargaining unit employees are exempt from the overtime requirements of the Fair Labor Standards Act.

2.      Bargaining unit employees will normally be assigned to work 8, 10, or 24-hour shifts.  Qualified bargaining unit employees may be required to work additional hours as deemed necessary by management.   Compensation for additional hours of work assigned by higher authority shall be in accordance with the Fire Rescue Department's work-back compensation policy and practice, except as modified herein.  Both 56-hour and 40-hour employees shall be eligible for work-back compensation.  Effective October 7, 2018, Block Pay amounts for work-back compensation for bargaining unit employees employed under this Agreement in the bargaining unit on active payroll as of the first full pay period after the date of Board approval of this Agreement shall be as follows, retroactive back to October 7, 2018:

Hours Worked Compensation

| 1-4.9 Hours | $200 |
| 5-9.9 Hours | $400 |
| 10-14.9 Hours | $600 |
| 15-24 Hours | $1,200 |

Additional compensation, if any, shall not alter the bargaining unit employees' FLSA overtime exempt status.

3.      Shift vacancies for 56-hour Battalion Chiefs shall be filled using a volunteer list for work-back selection if the entire shift (all combat positions) is below established departmental staffing levels, or if the vacancy brings the entire shift (all combat positions) below established departmental staffing levels.  If no Battalion Chief on the volunteer list for work-back selection accepts the assignment, then the Department may fill the vacancy with a qualified Captain or Lieutenant.   Shift vacancies for 56-hour Battalion Chiefs shall be filled with a qualified Lieutenant or Captain if the entire shift (all combat positions) is at or above established departmental staffing levels or if there are available qualified Lieutenants or Captains when lower ranking positions cannot be filled.  For long-term vacancies, (more than five (5) shifts or when the Department is notified that a vacancy of more than five (5) shifts will occur) the Department may assign, at its discretion, a qualified Lieutenant, Captain, or Battalion Chief to

fill the vacancy for all or part of the entire vacancy.  Pre-approved scheduled Personal Leave or Personal Days shall not constitute a long-term vacancy as defined in this Article.  However, if the vacancy will result in less than fifty percent (50%) of the regular Battalion Chiefs being on duty, and no Battalion Chief on the volunteer list accepts the assignment, then the Department may fill the vacancy using the Battalion Chief mandatory work-back list.

4.      Bargaining unit employees who are directed by a higher authority to work additional hours during states of emergency declared by the County will be paid block pay for all such additional time worked and any additional pay in accordance with applicable local rule or state or federal regulation.  Off-duty time or non-assigned time shall not be considered time worked for the purpose of this paragraph.

**ARTICLE 24**
**RECERTIFICATION AND MANDATORY TRAINING**

      1.     It is agreed and understood that compliance with State and County recertification requirements is the responsibility of the individual employees covered hereunder. The Department will make appropriate recertification courses available during normal duty hours at Departmental facilities to the extent management determines such to be feasible. Otherwise it shall be the employees' responsibility to attend such courses off duty at the location where they are offered. Nothing herein shall require the Department to compensate any bargaining unit employee for attending recertification courses off duty.

      2.     Formal scheduled mandatory training will be conducted at times specified by the Department. Formal scheduled mandatory training shall not be conducted on County recognized holidays.

      If the Department mandates an employee to attend training off-duty that is not offered by the Department on-duty, the employee will be eligible for work-back compensation.

46

## ARTICLE 25
## <u>PREVAILING RIGHTS</u>

1.     All negotiable terms and conditions of employment enjoyed by the bargaining unit employees which are not specifically included in this Agreement shall remain in full force during the term of this Agreement unless changed as authorized by this Agreement, or in accordance with applicable law.

# ARTICLE 26
## VOTING

1.      Employees who are unable to vote during their off-duty hours due to the location of their voting precincts, the unavailability of early voting options, and their work schedules may be permitted leave with pay (not to exceed two hours) to enable them to vote.  To qualify for such leave with pay, the employee shall file a written request with his/her Division Manager advising him/her of the reasons for requesting leave and providing him/her with confirmation of precinct location and voter registration.  Such request must be made at least seven (7) calendar days in advance, unless circumstances beyond the employee's control (including extra duty assignment) mandate less notice.

2.      Upon receipt of a timely and proper request in accordance with paragraph 1 above, the Division Manager shall schedule the employee's voting time in such a manner as to not interfere with operational requirements.  It is understood that employees covered hereunder are normally aware of their upcoming work schedule, and, therefore, can vote by absentee ballot or other early voting options if their work schedule causes a conflict with their ability to vote.  It, therefore, is further understood that there is no entitlement to leave with pay for voting and that operating requirements may preclude such time off (even if previously authorized by the Division Manager).

48

**ARTICLE 27**
**PROFESSIONAL COUNSELING**

1.      The County agrees to provide professional counseling services, such as the current Employee Assistance Program ("EAP"), to bargaining unit members and their families. In the event an employee volunteers for assistance, each employee's situation will be reviewed on a case-by-case basis.  When the employee voluntarily seeks counseling, all matters relating to counseling shall remain confidential and shall not be released to the County unless approved by the employee or as required by law.  However, the results and reports may be disclosed in any arbitration or litigation involving the employee.

2.      The County, in its discretion, may refer an employee covered hereunder to the Employee Assistance Program, a psychologist or psychiatrist, and/or a physician for counseling and/or evaluation where the County has reason to question the employee's fitness for duty or where the County believes that such counseling or evaluation would be of assistance to the employee with respect to his/her personal well-being and/or his/her job performance.  In cases of supervisory referrals or other requests by the County that the employee seek professional counseling, whether through the EAP or otherwise, including drug and alcohol counseling, program attendance, program compliance, program completion, and fitness-for-duty information shall be provided to the County, upon its request to the counselor or the employee.

49

**ARTICLE 28**
**UNIFORMS AND EQUIPMENT**

     1.     Uniforms, shoes, other required wearing apparel, and equipment will be furnished and replaced by the County in accordance with Department SOP's. The Union and employees agree to abide by such procedures and arrangements established by the County.

     2.     All items of the required uniforms not furnished to the employee pursuant to Department SOP's shall be furnished by the employee at his/her own expense. Bargaining unit members desiring to upgrade to a leather helmet may do so by reimbursing the County for the cost difference between the regular issue helmet and the cost of the leather helmet. The County maintains sole discretion to select the model and style of leather helmet. The County maintains sole discretion to determine the serviceability of any leather helmet and can require that leather helmets be removed from service for any reason, including safety concerns and appearance.

     3.     No insignia other than insignia approved by the Fire Chief shall be worn with any required uniform or other apparel. Employees may request in writing to the Fire Chief for authorization to wear one Union pin no larger than one inch in size on dress uniforms.

     4.     It shall be the responsibility of the bargaining unit employees covered hereunder to ensure that employees under their command are properly attired and that the Department SOP's governing uniforms, appearance, and equipment are enforced.

     5.     The parties agree that this Article may be amended by a Memorandum of Agreement entered into by the parties to switch to a uniform allowance system whereby uniforms are purchased by the employees from an authorized vendor.

50

**ARTICLE 29**
**REPLACEMENT OF PERSONAL PROPERTY**

1.    The County agrees to reimburse the full cost of prescription eye glasses and contact lenses not to exceed two hundred dollars ($200.00) and up to one hundred dollars ($100.00) for wrist watches damaged in the line of duty, provided adequate proof of such damage, the circumstances of the event and proof of value of the damaged items are presented to the Fire Rescue Department's Safety Officer for processing and verification of loss.    The employee must submit the original receipt for the cost of the new replacement item in order to be reimbursed.

51

## ARTICLE 30
## <u>LAYOFF/REDUCTION IN CLASSIFICATION</u>

1.      If the County determines that there is the need to lay off one or more bargaining unit employees, it shall so notify the Union and the employee(s) so affected at least two (2) weeks in advance of his/her (their) layoff.

2.      A copy of any notice of layoff shall be sent by certified mail to the employee's last-known address or hand delivered to the employee (with a copy to the Union).

3.      Should the County desire to recall a laid-off bargaining unit employee, it may do so by telephone and/or certified mail, whichever the County deems appropriate. Should the County recall an employee to a bargaining unit employee, he/she shall be given at least ten (10) days' notice prior to the date he/she is required to report.

4.      The right to lay off employees in bargaining unit positions and recall employees in such positions shall be within the exclusive discretion of the County, and shall be based on factors such as documented job performance, work/disciplinary history (for which grievance rights have been exhausted), and seniority.

5.      Bargaining unit employees shall be allowed, in lieu of layoff, to roll back into any previously held position within the Fire Rescue Department for which they are still qualified and to bump less senior employees; provided such is allowed by the rank-and-file collective bargaining agreement.

6.      Employees who promote out of the bargaining unit shall be allowed, in lieu of layoff, to roll back into any previously held position within the bargaining unit for which they are still qualified and to bump less senior employees.

7.      When a bargaining unit employee is reduced to the next lower job classification, seniority in the next lower job classification shall be computed by including previously accumulated service in the lower position to which he has been returned, plus time served in the higher position from which he is being reduced; provided such is allowed by the rank-and-file collective bargaining agreement.

## ARTICLE 31
## BENEFITS AND LEAVE

Except as otherwise specifically addressed herein, the County shall provide bargaining unit employees benefits and leave in accordance with the applicable County and/or Departmental policies.  Conversion of leave shall occur for employees going from a forty (40) hour workweek to a fifty-six (56) hour workweek and the reverse of this by multiplying the hours of accrued leave by the appropriate factor as is existing practice.

A.      BEREAVEMENT LEAVE

1.      In the event of a death in the bargaining unit member's immediate family, those working a twenty four (24) hour shift shall be granted two (2) shifts off.

2.      In the event of a death in the bargaining unit member's immediate family, those working a forty (40) hour workweek shall be granted five (5) days off, but no more than forty (40) hours.

3.      Should a bargaining unit member require additional time other than provided in the above, the bargaining unit member may request one additional shift with pay charged to old sick leave or personal leave subject to the approval of the Fire Chief or his designee.

4.      Immediate family shall be defined as spouse, mother, father, son, daughter, grandson, granddaughter, sister, brother, legal guardian, mother in law, father in law, daughter in law, son in law, stepparents, stepchildren and grandparents.

5.      Employees may be required to provide reasonable documentation to establish relationship as defined in 31.A.4 and documentation of the death; such as, marriage certificate, birth certificate, funeral service program, obituary, or death certificate.  Any request for such documentation will be made after the employee returns from leave.   The requested documentation must be submitted within 15 calendar days after the request is made.

B.      HOLIDAYS

1.      Employees in the bargaining unit who work a forty (40) hour week shall observe and receive pay at straight time for the number of hours normally scheduled for the below-listed holidays.

2.      Employees in the bargaining unit who work a fifty-six (56) hour work week shall receive holiday pay of one-half-time pay in addition to the applicable rate of pay for the following holidays worked.  For the purpose of this article, the holiday period will be defined

as a twenty-four (24) hour cycle starting at midnight and ending at midnight of the day that constitutes the holiday. Employees will be compensated for actual hours worked.

       3.    The following shall be the designated holidays for purposes of this article: New Year's Day; Martin Luther King, Jr. Day; Memorial Day; Independence Day; Labor Day; Thanksgiving Day; Day after Thanksgiving Day; Christmas Eve Day; Christmas Day; and one floating holiday to be taken at the employee's discretion subject to prior supervisory approval. Juneteenth shall be added as a designated holiday if the County adds this specific holiday for all other County employees in addition to the number of employee holidays already recognized by the County for non-union employees as of October 1, 2021.

C.    PERSONAL LEAVE

Employees shall earn and accrue personal leave in accordance with the following:

1.    40-Hour Employees

| Length of Continuous Service | Hours Accrued Per Pay Period | Days Per Year | Maximum Accrual Days |
|---|---|---|---|
| Under 5 years | 5.54 | 18 | 54 |
| Over 5 years | 6.16 | 20 | 60 |
| Over 6 years | 6.46 | 21 | 63 |
| Over 7 years | 6.78 | 22 | 66 |
| Over 8 years | 7.08 | 23 | 69 |
| Over 9 years | 7.39 | 24 | 72 |
| Over 10 years | 7.70 | 25 | 75 |
| Over 15 years | 8.31 | 27 | 81 |

2.    56-Hour Employees

| Length of Continuous Service | Hours Accrued Per Pay Period | Shift Days Per Year | Max Accrual Shift Days |
|---|---|---|---|
| Under 5 years | 14.76 | 16.00 | 48.00 |
| 5-10 years | 17.03 | 18.45 | 44.35 |
| 10-15 years | 18.88 | 20.45 | 61.353 |
| Over 15 years | 20.73 | 22.45 | 67.35 |

D.    TERM LEAVE

1.    40-hour employees shall earn term leave at the rate of .0231 hours of term leave

for each regularly scheduled paid hour of work. 56-hour employees shall earn .0513 hours of term leave for each regularly scheduled paid hour of work.

E.     DEFERRED RETIREMENT OPTION PROGRAM (DROP)

A.     Employees who choose to enter the DROP plan may sell back up to a maximum of 500 hours of accrued personal leave hours before entering the program.

B.     If the employee chooses to sell back accrued personal leave hours before entering the DROP plan, the maximum accrual shall remain at three years.

C.     Upon final retirement, the employee shall be eligible to sell back three years' worth of accrued and unused personal leave minus the amount sold back before entering the DROP.

F.     PERSONAL DAYS

1.     Employees promoted to Battalion Chief and Assistant Fire Marshal shall carry forward any Personal Days accrued and unused prior to their promotion.

2.     Each fiscal year, each 40-hour and 56-hour B-unit employee employed as of October 1 of that fiscal year will receive three Personal Days. These days will be awarded on the first full pay period of each fiscal year. The use of the Personal Days shall be in full day increments. The Personal Days will be converted to the 40 or 56-hour daily equivalent dependent upon the employee's schedule.

3.     The Personal Days earned as a B-unit employee may not be carried over from year to year, and the personal days earned as a B-unit employee that are not used by the end of the fiscal year shall be forfeited.

4.     Personal Days shall be used in the same manner as personal leave and will be tracked by County payroll. Upon separation from employment, employees shall not be entitled to any payment for unused Personal Days.

G. Sick Leave (Old)

1. Sick Leave (Old) shall be subject to the provisions of Orange County Policy Manual and Operational Regulations 303.

**ARTICLE 32**
**OUTSIDE EMPLOYMENT**

1.      County employment must be considered an employee's primary employment.  An
employee choosing to maintain outside employment (working for an employer other than the
County, engaging in self-employment or rendering services for interest) or seeking to serve as a
volunteer in any fire, EMS, or safety-related capacity must submit to the following:

A.      Written notification (company or entity name and job title only) shall be
forwarded to the County before commencing outside employment and before any
change in outside employment occurs.  Verification of outside employment will
be provided to the Division Chief on an annual basis, including representation that
such employment does not violate Section 33.02.  The County will be responsible
for determining whether the specific employment represents a conflict of interest
to Orange County or violates the restrictions in Section 33.02, and such
determination shall be final.  The notification shall be done by ID number only.

B.      Notification of outside employment must be provided upon request of the Fire
Rescue Department or the County's workers' compensation carrier whenever an
employee files a Notice of Injury claim with Orange County.

2.      Outside employment shall not:

A.      Interfere with the performance of County duties or conflict with County interests.

B.      Be in violation of Orange County Policy.

C.      Occur during a period in which the employee is receiving paid sick leave or other
leave (including workers' compensation leave) from Orange County.

D.      Be covered by the County's workers' compensation benefits if an employee is
injured, disabled, or becomes ill as a result of outside employment.

E.      Utilize County time, equipment, facilities, vehicles or other County property.

F.      Be with another Fire or Rescue Department or provider or involve any fire-related
work, including any volunteer work in these capacities (except in declared
emergencies).  This provision will not apply to any employees who, as of October
1, 2002, currently have approval for work in any fire-related capacity.   Those
employees who had approval as of October 1, 2002, must submit a new
notification to management and obtain approval pursuant to section 33.01A if

56

there is any change in their job status.

G.    Take place within 8 hours before the employee's work-shift with the County.

## ARTICLE 33
## MODIFIED TEMPORARY DUTY AND MEDICAL SEPARATION

1.    An employee who misses work as a result of a work related injury that is compensable under the Workers' Compensation Law, Chapter 440, Florida Statutes (or subsequently amended), shall receive his/her normal salary for the time actually missed up to a maximum of seven (7) calendar days, beginning with the date of injury.

2.    If the employee is unable to resume work at the end of seven (7) calendar days, Workers' Compensation will begin on the eighth (8th) day in accordance with the Workers' Compensation Law now in effect (or with statutory provisions if subsequently amended).

3.    Employees injured as a result of a work related accident or illness resulting in a Workers' Compensation claim or off-duty illness, injury or any other medical condition which creates an inability for the employee to perform his normal work duties, may be placed in a modified temporary duty assignment subject to the following conditions:

A.    Assignments will only be available for employees who have incurred on the job injuries or illnesses first, followed by off-duty injuries or illnesses.

B.    All policy guidelines for Workers' Compensation must be followed.    (See WORKERS' COMPENSATION CLAIMS in the Policy Manual).

C.    Employees must be certified by the County designated physician as eligible for a modified temporary assignment.

D.    All assignments must have prior concurrence of the Manager of the Human Resources Division and the Manager of the Risk Management Division.

E.    All assignments will be subject to availability as determined by management and will be made subject to certification of the employee's eligibility by the County designated physician or personal physician in the case of off-duty injury or illness.

4.    Placement on any modified temporary duty assignment will be made first within the Division where the employee worked when the injury occurred and second, within that department.  Each Department and Division will develop, assign and monitor their own modified temporary duty assignments according to operational needs.  Any changes in modified temporary duty assignments will be coordinated with the Risk Management Division.

5.      Work hours for all modified temporary assignments will be at the discretion and based on operational needs of the Division providing the assignment.

6.      Consideration will be given to the employee's condition and requirements for access to follow up treatment.

7.      If released for modified temporary duty by the County designated physician, the employee must report for an assignment when the division or department makes the assignment available.

8.      The County will contact the employee by telephone when possible, and additionally, employees will be contacted by certified return receipt mail for the purpose of verification.

9.      Following an on the job injury, all employees will follow the guidelines for Workers' Compensation claims as outlined in the Orange County Policy manual.  The County designated physician will certify eligibility for an assignment and will act as primary case manager.  The County designated physician will recertify eligibility on a regular basis in coordination with the Risk Management Division.

10.      Modified temporary assignments will be reviewed after 90 calendar days from the date of assignment to modified temporary duty, and may be extended in Management's sole discretion.  Modified temporary assignments shall not exceed six months without review.  Once an employee reaches ninety (90) days but not later than six months on a temporary assignment or has been unable to work in his permanently assigned position for a total of six months, the employee, a member from fire rescue risk management, and the Deputy Chief or his designee will meet.  The purpose of the meeting will be to determine if the employee can produce any medical evidence that he may return to full duty within 30 days.  Management will have the sole discretion to extend the temporary assignment or defer the medical separation process if the employee provides medical evidence that he will be able to return to his regular duty assignment. If, in the sole discretion of management, the employee fails to produce medical evidence that he can return to full duty, management has the right to medically separate the employee. Management will not be required to use the PDH process to effect a medical separation.  An employee who is released by the County designated physician as medically capable of performing all assigned duties of the position held when injured will be returned to this position immediately, subject to any necessary training or updates required by management.

11.      An employee will be entitled to a second medical opinion at the employee's expense. If the medical opinions differ, then the final return to work determination will be made by the County designated physician.

12.      The County will comply with the ADA for all eligible medically separated

employees.     In addition, the County may offer other assistance to a medically separated
employee as it deems necessary or appropriate.  Upon meeting Maximum Medical Improvement
(MMI) the employee, unable to return to the job, will be placed in the Americans with Disability
Act (ADA) process and if no alternate position within the County can meet the employee's
necessary  reasonable  accommodations,  the  employee  may  be  terminated  without  a
Predetermination Hearing.

     13.     Employees placed in a modified temporary duty assignment will retain the full
rate of pay received at the time of injury and will be paid by the Division in which they worked
when injured.

     14.     Employees will have no change in classification during assignment to a modified
temporary duty position.   All benefits will continue and no break in service or loss of
classification will occur.

## ARTICLE 34
## EDUCATIONAL ASSISTANCE

1.      Bargaining unit employees shall be eligible for participation in the County's educational assistance program to the same extent that the program is available to all County employees, except that they will be eligible for reimbursement for required tuition expenses of up to $1,500 per fiscal year (October 1st – September 30th) for the successful completion of approved course work.  Requests for reimbursement will be processed for payment during the same pay period in which the completed request is received in Human Resources and will be applied to the fiscal year cap based on the pay date for that pay period.

2.      The employee, may be entitled to receive educational assistance, up to $3,000, for required tuition expenses which have been paid by the employee for the successful completion of pre-approved coursework towards an accredited Master's Degree program. This reimbursement shall constitute the employee's $1,500 educational assistance allocation as set forth in Section 1 above for two fiscal year periods. Bargaining unit employees shall not receive more than $3,000 in educational assistance in any two consecutive fiscal years.

3.      Employees who separate from County employment for any reason, other than layoff due to organizational needs, prior to completion of twenty-four (24) months of employment following tuition reimbursement for an accredited Master's Degree program shall repay the County for all reimbursement received for the approved Master's Degree program.

60

**ARTICLE 35**
**SAVINGS CLAUSE**

1.      If any provision of this Agreement or the application of such provision should be
rendered or declared invalid by a court of competent jurisdiction or the Florida PERC, or by
reason of any existing or subsequently enacted legislation, the remaining parts or portions of the
Agreement shall remain in full force and effect.  The parties shall enter into collective bargaining
negotiations for the purpose of arriving at a mutually satisfactory replacement for any such
article or section rendered or declared invalid.

2.      The Union and the County agree to reopen any Article of the Agreement when
there is Federal or State Legislation enacted that has an adverse impact on and/or prevents the
County's ability to pay benefits contained in the Agreement.

**ARTICLE 36**
**ENTIRE AGREEMENT/DURATION**

1.     The parties acknowledge that during negotiations which resulted in this agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by both parties after the exercise of that right and opportunity are set forth in this Agreement.  The parties hereto may commence negotiations, under applicable law, on any succeeding agreement to take effect upon termination of this Agreement.

2.     If either the County or the Union desires to modify, amend or terminate this Agreement at its normal expiration date, official notice of such desire must be given in writing at least ninety (90) days prior to the termination date of this Agreement.  Following receipt of such notice, unless there is a mutual agreement to the contrary, the County and the Union shall commence negotiations.   In the absence of an official notice by either party of its desire to modify, amend or terminate this Agreement, this Agreement shall automatically renew for an additional year, and from year to year thereafter until timely notice is given of a party's intent to renegotiate this Agreement.

3.     Nothing herein shall preclude the parties from mutually agreeing to reopen this Agreement, or to renegotiate any provision herein, during the effective dates of this Agreement.

4.     This Agreement shall become effective October 3, 2021 or the first full pay period after Board approval, whichever is greater and shall remain in effect until September 30, 2024. No provision of this Agreement shall be applied retroactive to a date prior to Board approval unless the provision expressly provides for retroactive application.

THIS CONTRACT AGREED TO THIS _____ DAY OF _____ 2021.


_____          _____
Byron W. Brooks, AICP                       Andre Perez, President
County Administrator                        Orange County Fire Fighters Association,
Orange County                               I.A.F.F., Local No. 2057
                                            Battalion Chief Unit


THIS AGREEMENT APPROVED BY THE ORANGE COUNTY BOARD OF COUNTY COMMISSIONERS, ORANGE COUNTY, FLORIDA ON THIS _____ DAY OF_____, 2021.


_____          _____
Deputy Clerk, Orange County Board           Jerry L. Demings
of County Commissioners                     Orange County Mayor

# EXHIBIT E

Reply all | ∨    🗑 Delete    Junk | ∨    •••    ✕

RE: Forms

 Davis, Stephen M
Tue 10/5, 7:36 PM
Buffkin, Kimberly L (Battalion Chief)  ∨

Reply all | ∨

Sent Items

Chief,

Mesa and Landers are state they are vaccinated and filled out the county forms. Is there a way to confirm this? Secondly, station 50 does not have any test kits at their station. I have 5 boxes here, however, each box has an expired lot number that is not on the two pdfs you sent out. How do you want me to proceed? It appears that all kits in B4 are expired too. I have reached out to all stations to get confirmation of their kits and each of them showed the same lot numbers.

## Stephen M. Davis #1486
## Battalion Chief/Paramedic II CCP

**Orange County Fire Rescue Department**
Operation Division, Charlie Shift, 4th Battalion
407-254-8451 office
407-458-3139 cell



**From:** Buffkin, Kimberly L (Battalion Chief) <Kimberly.Buffkin@ocfl.net>
**Sent:** Tuesday, October 5, 2021 5:55 PM
**To:** Atan, Juan M (Battalion Chief) <Juan.Atan@ocfl.net>; Broccolo, Richard J <Richard.Broccolo@ocfl.net>; Pierce, Dustin G <Dustin.Pierce@ocfl.net>; Davis, Stephen M <Stephen.Davis@ocfl.net>; Gross, Wendy J (Battalion Chief) <Wendy.Gross@ocfl.net>; Phillips, Anthony D <Anthony.Phillips@ocfl.net>; Henesy, Christopher M <Christopher.Henesy@ocfl.net>
**Subject:** Forms

See attached forms. The spreadsheet are all personnel that had not submitted the online certification by the September 30 deadline. They will all receive the written reprimand. Please let me know if you have any questions.

Kimberly Buffkin
Assistant Chief, C Shift
Orange County Fire Rescue Department
Cell 321.436.6690
kimberly.buffkin@ocfl.net

# EXHIBIT F

**FW: Accommodations Request Acknowledgment**

Daniel.Novoa@ocfl.net <Daniel.Novoa@ocfl.net>

Fri 10/8/2021 8:53 PM

To: **Covid-Mandate <Covid-Mandate@ocffa.com>**

Cc: Ronald.Joseph@ocfl.net <Ronald.Joseph@ocfl.net>

📎 1 attachments (545 KB)

Written R.pdf;

Paul.

Here is the information you requested in reference to my rookie Firefighter Joseph receiving a written, even after he received a confirmation from County HR.

Danny Novoa

**From:** Atan, Juan M (Battalion Chief) <Juan.Atan@ocfl.net>
**Sent:** Tuesday, October 5, 2021 11:16 PM
**To:** Novoa, Daniel (Lieutenant) <Daniel.Novoa@ocfl.net>
**Subject:** FW: Accommodations Request Acknowledgment

Please see Chief Buffkin response.

*Juan M. Atan , MS,EMT-P*
*Orange County Fire Rescue*
*Battalion 1 C Shift*
*407-254-8441 (Office)*
*407-383-9084 (Cell)*
*Juan.Atan@ocfl.net*
*"The way you train today is the way you will perform tomorrow"*

 

**From:** Buffkin, Kimberly L (Battalion Chief) <Kimberly.Buffkin@ocfl.net>
**Sent:** Tuesday, October 5, 2021 11:09 PM
**To:** Atan, Juan M (Battalion Chief) <Juan.Atan@ocfl.net>
**Subject:** RE: Accommodations Request Acknowledgment

All are to be issued the written. Per IB 21-187 the direction is to email HR for them to update their records. The discipline will be adjusted accordingly once HR confirms the status.

He also needs to contact HR to ensure they update his status.


Kimberly Buffkin
Assistant Chief, C Shift
Orange County Fire Rescue Department
Cell 321.436.6690
kimberly.buffkin@ocfl.net


---

**From:** Atan, Juan M (Battalion Chief) <Juan.Atan@ocfl.net>
**Sent:** Tuesday, October 5, 2021 11:02 PM
**To:** Buffkin, Kimberly L (Battalion Chief) <Kimberly.Buffkin@ocfl.net>
**Subject:** FW: Accommodations Request Acknowledgment

Chief,

I received this from Lt. Novoa regarding Ronald Joseph. Please advise.

*Juan M. Atan , MS,EMT-P*
*Orange County Fire Rescue*
*Battalion 1 C Shift*
*407-254-8441 (Office)*
*407-383-9084 (Cell)*
*Juan.Atan@ocfl.net*
*"The way you train today is the way you will perform tomorrow"*



---

**From:** Novoa, Daniel (Lieutenant) <Daniel.Novoa@ocfl.net>
**Sent:** Tuesday, October 5, 2021 9:28 PM
**To:** Atan, Juan M (Battalion Chief) <Juan.Atan@ocfl.net>
**Cc:** Joseph, Ronald <Ronald.Joseph@ocfl.net>
**Subject:** FW: Accommodations Request Acknowledgment

Evening Chief

Here's proof showing that firefighter Joseph did follow and completed his requirement on and or prior t the required deadline. With the attach proof the reprimand would be noel and voided due to him following the guideline requested

Lt Daniel Novoa
40/C

---

**From:** Joseph, Ronald <Ronald.Joseph@ocfl.net>
**Sent:** Tuesday, October 5, 2021 8:40 PM
**To:** Novoa, Daniel (Lieutenant) <Daniel.Novoa@ocfl.net>
**Subject:** FW: Accommodations Request Acknowledgment

---

**From:** Employee Relations <EmployeeRelations@ocfl.net>
**Sent:** Thursday, September 30, 2021 4:19 PM
**To:** Employee Relations <EmployeeRelations@ocfl.net>
**Subject:** Accommodations Request Acknowledgment

Hello,

This is to confirm we have received your request for an accommodation.

We are in the process of reviewing and assigning your requests to a Human Resources Representative.

Once assigned, the representative will reach out to you directly within the next week.

Attached is a document to assist with understanding **"What's Next?"** in the process.

**Please do not respond directly to this email. The originating email account does not have any additional information on your request.**

Thank you,

*Employee Relations*
**Human Resources Administration**
Internal Operations Centre I, 1st Floor
450 E South Street | Orlando | 32801



PLEASE NOTE: Florida has a very broad public records law (F. S. 119). All e-mails to and from County Officials are kept as a public record. Your e-mail communications, including your e-mail address may be disclosed to the public and media at any time.

# EXHIBIT G

## Fwd: Accommodation

**BC Steward (Steve Sherrill) <BCSteward@ocffa.com>**
Sat 10/9/2021 10:37 AM
To: **Covid-Mandate <Covid-Mandate@ocffa.com>**


Steve Sherrill
Local 2057 – BC Rep
407-619-4116

Begin forwarded message:

> **From:** "Sherrill, Steven M" <Steven.Sherrill@ocfl.net>
> **Date:** October 6, 2021 at 6:11:54 PM EDT
> **To:** "Mack, Martis M" <Martis.Mack@ocfl.net>
> **Subject: FW: Accommodation**


FYI.

Thank you,

*Steven M. Sherrill*

Battalion Chief – B4 A-Shift
Orange County Fire Rescue Department
Office: 407-254-8451
Cell: 407-832-3381

---

**From:** Davis, Reginald C <Reginald.Davis@ocfl.net>
**Sent:** Wednesday, October 6, 2021 3:20 PM
**To:** Sherrill, Steven M <Steven.Sherrill@ocfl.net>
**Cc:** Welch, Charles R <Charles.Welch@ocfl.net>; Shields, Suzette C <Suzette.Shields@ocfl.net>; Wajda, Michael J <Michael.Wajda@ocfl.net>
**Subject:** Re: Accommodation


Sherrill,

Copying DC Wajda. If an employee says they submitted an exemption on or before Sept 30th, I would recommend checking with Charles to confirm, prior to issuing any discipline.

If confirmed, the discipline should not be issued.

Thanks,

Reggie

-------- Original Message --------
From: "Sherrill, Steven M" <Steven.Sherrill@ocfl.net>
Date: Wed, Oct 6, 2021, 3:00 PM
To: "Davis, Reginald C" <Reginald.Davis@ocfl.net>
Subject: RE: Accommodation

That's not what is happening. I have been issuing discipline today for those who claim they
filed an exemption.

Thank you,

*Steven M. Sherrill*

Battalion Chief – B4 A-Shift
Orange County Fire Rescue Department
Office: 407-254-8451
Cell: 407-832-3381

_____

**From:** Davis, Reginald C <Reginald.Davis@ocfl.net>
**Sent:** Wednesday, October 6, 2021 2:39 PM
**To:** Sherrill, Steven M <Steven.Sherrill@ocfl.net>; FR-Administration-Fire HR Service
Center <FR-Administration-FireHRServiceCenter@ocfl.net>
**Subject:** Re: Accommodation

Sherril,

Prior to any discipline being issued, the department has been asked to first verify with the
staff member if they have an exemption on file.  So, you may be on the list, but after that
verification is done, you would ultimately not receive any discipline if you submitted on or
before Sept 30th.

Unfortunately, a lot of request came through on Sept 30th.

Thanks,

Reggie

-------- Original Message --------
From: "Sherrill, Steven M" <Steven.Sherrill@ocfl.net>
Date: Wed, Oct 6, 2021, 1:50 PM
To: FR-Administration-Fire HR Service Center <FR-Administration-
FireHRServiceCenter@ocfl.net>,"Davis, Reginald C" <Reginald.Davis@ocfl.net>
Subject: Fwd: Accommodation

Begin forwarded message:

>   **From:** "Sherrill, Steven M" <Steven.Sherrill@ocfl.net>
>   **Date:** October 6, 2021 at 1:05:59 PM EDT
>   **To:** "Welch, Charles R" <Charles.Welch@ocfl.net>, "Mora, Katherine"

<[Katherine.Mora@ocfl.net](mailto:Katherine.Mora@ocfl.net)>, "Gibson, Latarsha" <[Latarsha.Gibson@ocfl.net](mailto:Latarsha.Gibson@ocfl.net)>
**Subject: Accommodation**

 Good afternoon,

I am on the list of employees receiving a written reprimand, however, I
submitted my religious exemption on 9/30. Why am I receiving discipline when
I sent my accommodation request by the deadline?

Regards,

*Steven M. Sherrill*

Battalion Chief – B4 A-Shift
Orange County Fire Rescue Department
Office: 407-254-8451
Cell: 407-832-3381

# EXHIBIT H

 Reply all | ⌄    🗑 Delete    Junk | ⌄    •••    ✕

## Next shift

 **Buffkin, Kimberly L (Battalion Chief)**    ↩ Reply all | ⌄
Wed 10/6, 6:35 AM
Atan, Juan M (Battalion Chief); Broccolo, Richard J; Pierce, Dustin G; Davis, Stephen M; Gross, Wendy J (Battalion Chief); Phillips, Anthony D; Henesy, Christopher M  ⌄

Inbox

 | Action Items    🗓

All –
I am off next shift. Please follow up with those that were out today to complete the written reprimands. Remember if anyone has received the vaccine or believe their status is incorrect, have them email 3 people at HR: Charles Welch, Kathy Mora AND Latarsha Gibson and include any supporting documentation they have such as emails, etc. If they haven't completed the attestation online, that indicates they are now vaccinated, make sure they complete that.

Thank you all for your work this shift, I know it was a rough day. I appreciate you all.

Kimberly Buffkin
Assistant Chief, C Shift
Orange County Fire Rescue Department
Cell 321.436.6690
kimberly.buffkin@ocfl.net

# EXHIBIT I

**ORANGE COUNTY FIRE RESCUE DEPARTMENT**
**Michael A. Howe, Assistant Chief, Training**
P.O. Box 5879
Winter Park, Florida 32793-5879
(407) 836-9000  Fax (407) 836-9138
e-mail: Michael.Howe@ocfl.net

| Received: _____ | Date: _____ |
|---|---|
| Delivered: *Michael A H* | Date: 10/18/21 |

October 18, 2021

Stephen Davis, Battalion Chief
6590 Amory Court
Winter Park FL 32792

*Predetermination Hearing Decision Letter*

Chief Davis,

A Predetermination Hearing was held on October 13, 2021, pertaining to you refusing to follow a direct order on October 5, 2021. During the PDH the following personnel were present: Assistant Chief Howe- Hearing Officer, Assistant Chief Buffkin- Observer, Assistant Chief Mack- Observer, Battalion Chief Stone- Observer, Battalion Chief Teamer- Observer, Charles Welch- Human Resources, Paul Riccardi- Local 2057, Steve Sherrill- Local 2057, Chris Newsome- Local 2057 and you.

I have carefully reviewed all written documentation; audio recordings as well as oral testimonies presented during the hearing and have made the following conclusions and determinations:

- You admitted you read GO 21-012 (Vaccine Mandate and Certification) that was published on August 20, 2021 and completed the Target Solutions associated with the GO

- You admitted you read GO 21-013 (Vaccine Mandate and Certification Update) that was published on August 31, 2021 but did not recall if you completed the Target Solutions associated with it

- You admitted you read GO 21-015 (On-site COVID Testing Target Solutions Training) that was published on September 30, 2021 but did not recall if you completed the Target Solutions associated with it

- You admitted you knew beginning October 4, 2021 the County was going to begin testing personnel who did not complete the vaccination verification

- You admitted you knew the County was going to begin issuing written reprimands to personnel who did not complete the vaccination verification form or file for an accommodation but you did not know they would begin issuing them immediately

- You admitted your first working shift after this took place was Tuesday, October 5, 2021

- You admitted Chief Buffkin discussed with you that personnel will be administering tests and reprimands would be issued to the applicable C-Shift personnel on October 5, 2021

- You were asked if you issued written reprimands to the personnel in Battalion 4 who were on the list to which you replied no you did not

- You admitted Chief Buffkin had a phone conversation with you on October 5, 2021 where she advised you it was a general order to issue the reprimands

- You admitted Chief Buffkin had you report to station 30 that evening with a Union Representative to further discuss the issue

- You admitted while at station 30, Chief Buffkin told you it was a direct order to issue the reprimands

- You admitted while at station 30, Chief Buffkin read Standard Operating Procedure 046, Non-Emergency Incident Directives (Direct Orders) verbatim to you

- You admitted you completely understood the direct order and the SOP that was read verbatim by Chief Buffkin and even initialed the policy when she was done

- Even after Chief Buffkin gave you a direct order (that you completely understood) while at station 30 to issue the reprimands, you still refused to comply with the order

Based on the information listed above, it is clear you refused to comply with a direct order issued by Chief Buffkin on October 5, 2021. Upon evaluation of the information presented, I find you have violated the following:

- Orange County Fire Rescue Department Rules, R.5 Performance of Duty

- Orange County Fire Rescue Department Rules, R.24 Unbecoming Conduct

- Orange County Fire Rescue Department Rules, R.32 Insubordination

- Orange County Fire Rescue Department Rules, R.36 Adhering to and Reporting Improper Orders

- Orange County Fire Rescue Standard Operating Procedures, SOP 046 Non-Emergency Incident Directives (Direct Orders)

- Orange County Firefighters Association Collective Bargaining Agreement (B Unit), Article 12 (1), Grievance and Arbitration Procedures

- Orange County Firefighters Association Collective Bargaining Agreement (B Unit), Article 3, Managerial Responsibilities/Conflicts of Interest

I have reviewed the violations under the Orange County Fire Rescue Department Standard Operating Procedures SOP 06, Corrective Disciplinary Matrix as well as the Orange County Policy Manual & Operational Regulations 413, Disciplinary Action and have determined your actions to be:

1. B. Performance Deficiencies

    (1) Failure to follow operational procedure

2. C. Behavioral Issues/Unsatisfactory Personal Habits

    (4) Dereliction of duty – willful refusal to perform assigned duties or follow a direct order

    (7) Conduct in a work or non-work environment which discredits the County government, public officials, fellow employee(s), or themselves

After consideration of all the information and testimony presented, reviewing the violations of policies, Union Contract Article 10, Discipline, taking into consideration the seriousness of the offense, your employment history, the lapse of time between discipline and the County practice in similar cases, it is my decision to impose the following:

- Your employment with Orange County Fire Department will be terminated at 1700 on October 19, 2021

- You are directed to return all County/Department issued items in accordance with SOP 027, Separation Process to the Supply Bureau located at 400 S. Gaston Foster Road by October 25, 2021

Employees are also encouraged to contact the County's EAP provider, ComPsych whenever they are experiencing personal and/or work related difficulties.

See below for more information on ComPsych®:

Employee Assistance Program (EAP)
ComPsych® GuidanceResources® Program
Call: 855.221.8925
TDD: 800.697.0353
Go Online: guidanceresources.com
Your company Web ID: ORANGECOUNTY

Should you not agree with this decision, you have the right to appeal in accordance with
the agreement between Orange County and the Orange County Professional Firefighters
Local 2057, Article 12 Grievance and Arbitration Procedures. For the ability to dispute
these findings by way of the grievance procedure, your date of knowledge will begin upon
receipt of this letter.

Respectfully,

Michael A. Howe
Assistant Chief, Training


c:    James M. Fitzgerald, Fire Chief
      David Rathbun, Deputy Chief
      Mike Wajda, Division Chief, Operations
      Kimberly Buffkin, Assistant Chief, C-Shift
      David Hepker, Program Administrator
      Nichol Stratman, Battalion Chief, Centralized Staffing
      Charles Welch, Senior Human Resource Advisor
      Suzette Shields, Compliance and Employee/Labor Relations Administrator
      Ricardo Daye, Director, Orange County Human Resources

# EXHIBIT J

FW: Religious Accommodation 117573
October 20, 2021 at 7:38 PM
Buffkin, Kimberly L (Battalion Chief)

**From:** Coats, Daniel B <Daniel.Coats@ocfl.net>
**Sent:** Wednesday, October 20, 2021 7:31 PM
**To:** Preston, Jared V <Jared.Preston@ocfl.net>
**Subject:** FW: Religious Accommodation 117573
Here is the confirmation email from HR

**From:** Human Resources <HumanResources@ocfl.net>
**Sent:** Thursday, September 30, 2021 4:46 PM
**To:** Coats, Daniel B <Daniel.Coats@ocfl.net>
**Subject:** Automatic reply: Religious Accommodation 117573
Thank you for your email. If this is an urgent matter and requires immediate assistance, please call the main HR line at 407-836-5661 or call/visit one of our HR service centers.
If this is not a time sensitive matter, an HR representative who can best address your question/issue will follow up with you as soon as possible.
Additionally, if you looking for information regarding COVID-19, please visit the COVID-19 Employee Resources Page.
Sincerely,
Orange County Human Resources

From: "Preston, Jared V"
Subject: RE: New Verification and Refusal to Test Reprimands
Date: October 20, 2021 at 10:04 PM
To: Buffkin, Kimberly L (Battalion Chief)

Just to confirm we are holding off on Lt. Coats' reprimand for now, correct?
I have his already signed in the event it needs to be issued.
JP

**From:** Buffkin, Kimberly L (Battalion Chief) <Kimberly.Buffkin@ocfl.net>
**Sent:** Wednesday, October 20, 2021 8:41 PM
**To:** Preston, Jared V <Jared.Preston@ocfl.net>
**Subject:** FW: New Verification and Refusal to Test Reprimands
**Importance:** High

**From:** Howe, Michael A <Michael.Howe@ocfl.net>
**Sent:** Wednesday, October 13, 2021 1:20 PM
**To:** FR-Assistant Chiefs <FR-AssistantChiefs@ocfl.net>
**Cc:** Wajda, Michael J <Michael.Wajda@ocfl.net>; Rathbun, David A <David.Rathbun@ocfl.net>
**Subject:** New Verification and Refusal to Test Reprimands
**Importance:** High

AC's,

Here are the new templates for the discipline related to the not completing the vaccination verification and refusing to test.

> · **If there are personnel who have not received the written reprimand for not completing the vaccination verification ONLY use the one attached (you will have to hand write the names and employee ID in as the document had to be changed)**
> · **For personnel who refuse to test use the applicable one attached**

If you have any questions, please contact me.

Thanks,

Mike

Michael A. Howe
Assistant Chief, Training
(O) 407-254-9005
(C) 407-948-0089

# EXHIBIT K



**ORANGE COUNTY FIRE RESCUE DEPARTMENT**
**David A. Rathbun, Deputy Fire Chief**
P.O. Box 5879
Winter Park, Florida  32793-5879
407-836-9019 Fax: 407-836-9106
David.Rathbun@ocfl.net

Received: _____ VP I _ Date: 12/14/21

Delivered: _____ Date 12/14/2021

December 13, 2021

Andre Perez, President
Orange County Fire Fighters Association
6969 Venture Circle
Orlando Florida 32807

Re: Grievance Hearing Decision, Step-2, # 21-12193 (Stephen Davis)

Dear Andre,

A Step-2 grievance hearing was held on November 30, 2021 to address grievance 21-12193. By way of your grievance and verbal testimony, you have alleged that management violated:

- Collective Bargaining Agreement:
    - Articles 2, 3, 6, 9, 10, 12, 16, and 25
- Orange County Fire Rescue Standard Operating Procedures
    - R-2, R-3, R-8, R-33, R-35, SOP-006, and SOP-046
- Orange County Policies:
    - Code of Ethics, 402, and 413

After much deliberation and careful consideration of all written and verbal evidence presented during the hearing, I find that management did not violate the collective bargaining unit articles cited in your grievance. Therefore, your grievance is denied.

Sincerely,

David A. Rathbun
Deputy Fire Chief

C:    James M. Fitzgerald, Fire Chief
      Michael Wajda, Division Chief, Operations
      Mike Howe, Assistant Chief
      Charles Welch, Human Resources Senior Advisor